Argued October 16, 1935; affirmed January 14, 1936

IN RE DOUGAN'S ESTATE

CHAPPELLE ET AL. *v.* WILLIAMS

(53 P. (2d) 511)

*Jesse G. Warrington,* of Portland (A. E. Wheelock, of Portland, on the brief), for appellants.

*Homer D. Angell,* of Portland (Angell & Fisher, of Portland, on the brief), for respondent.

ROSSMAN, J. The issues are (1) did Nettie J. Dougan, who executed a will on November 28, 1933, possess sufficient testamentary capacity on or about August 10, 1934, to enable her to revoke it on that day as her son, Roy L. Williams, the respondent, alleges; (2) did she, on or about August 10, 1934, obliterate the will and declare it revoked; and, if so, (3) did she intend that the alleged revocation should be unconditional, or that it should be dependent upon her execution of a new will.

Nettie J. Dougan executed a will November 28, 1933, and died August 29, 1934, aged 68 years, leaving an estate appraised at $30,820.16. Her only child, now a man of mature years, is the respondent. The will gave him a bequest consisting of some building certificates, appraised as valueless, and 44 shares of the preferred

stock of the H. S. & D. Investment Company, appraised as worth $880. The principal items of Mrs. Dougan's estate consisted of shares of stock of the H. S. & D. Investment Company, a corporation, owner of the Medical Dental building of Portland. Her will, besides containing the aforementioned bequest in favor of her son, bequeathed $4,000 to a nephew of her deceased husband. All of the remainder of the estate was bequeathed to non-relatives. The residuary legatees are H. H. Lehman, manager of the Medical Dental building, and Mrs. Helen Mills of Seattle, who had served Mrs. Dougan as a seamstress and who in time became a friend. At the time the will was executed an estrangement existed between Mrs. Dougan and her son. The latter, who was married, resided in San Francisco. Mrs. Dougan, who was a widow, lived in Portland. July 13, 1934, Mrs. Dougan suffered a cerebral hemorrhage. August 3, 1934, a second attack occurred, and August 21, 1934, she suffered a final stroke from the effects of which she died August 29, 1934, without regaining consciousness.

The son contends that, on August 10, 1934, his mother revoked the aforementioned will by obliterating with pen and pencil large portions thereof and by declaring at the same time that the instrument was no longer her will. The proponents of the will contend that the cerebral hemorrhage which occurred on July 13, 1934, deprived Mrs. Dougan of testamentary capacity so that on August 10, when it is alleged Mrs. Dougan revoked the will, she lacked sufficient understanding to enable her to effect its cancellation.

At the time of Mrs. Dougan's death the will, which it is alleged she had revoked, was in the possession of Mr. A. E. Wheelock, the attorney who had prepared it. Immediately following her death her son was ap-

pointed administrator. Thirteen days later he presented for filing (but not for probate) the alleged revoked will. This instrument, with many pen and pencil marks upon it, had been handed by Mrs. Dougan to Mr. Wheelock on August 20, 1934, when she requested him to prepare a new will. The instrument consists of four typewritten pages. Across much of the typewriting are ink and pencil marks, some of which are so heavy that the typewritten matter is almost illegible. Some of the other markings are crisscross; and still others are rambling. Near the attestation clause are three horizontal pencil markings. Mrs. Dougan's signature is not touched by any mark. Mr. Lehman, one of the two residuary legatees, testified that about the first of August, 1934, while visiting Mrs. Dougan in her apartment she produced her will and that, at her request, he drew ink lines through the following lines of the will: "Eighth: I give unto Virginia MacDonough my diamond wrist watch, my mahogany lamp with prisms and ten". He testified that, also at her request, he wrote the numeral 5 over the numeral 10 which immediately follows the last word above quoted. The words quoted are followed with: "10 shares of the preferred stock of the H. S. & D. Investment Company of Portland, Oregon". Later, according to the testimony, Mrs. Dougan drew an ink line through the words "of the preferred stock of the H. S. & D. Investment Company of" and then crisscrossed the entire bequest.

August 20, 1934, Mrs. Dougan, accompanied by two friends, Mr. and Mrs. Claud Sheeley, called at the office of Mr. Wheelock and handed him the mutilated will, together with a draft of a new will prepared by Mr. Sheeley at Mrs. Dougan's direction. She then requested Mr. Wheelock to prepare for her a new will follow-

ing the outline of the draft. The principal changes incorporated in the draft were the elimination of Mr. Lehman and Mrs. Mills as beneficiaries, and the substitution of Mrs. Dougan's son in their places. After the Sheeleys had departed a two-hour conference occurred between Mrs. Dougan and Mr. Wheelock in the course of which the latter made some notations upon the will. The evidence indicates that, apart from the notations and marks made by Mr. Wheelock, Mr. Lehman, and an occasional mark made by Mr. Sheeley, all the marks upon the will were made by Mrs. Dougan August 10, 1934. Mr. Sheeley swore that he prepared the draft August 18, 1934, after he had held several conferences with Mrs. Dougan which commenced August 10. He and Mrs. Sheeley, who apparently were disinterested, testified that on the date last mentioned Mrs. Dougan visited them and requested Mr. Sheeley to prepare for her a new will. Both swore that at that time Mrs. Dougan stated that she had lost confidence in Mrs. Mills and in Mr. Lehman, that she was displeased with them, and that she now loved her son. According to them, she then made the marks upon the will attributed to her in the preceding lines, explaining, as she proceeded, her reasons for eliminating the stricken bequests. Both swore that she many times stated that the instrument was no longer her will.

Before proceeding further with a statement of the evidence concerning the alleged revocation, we shall mention the testimony concerning the mental capacity of Mrs. Dougan on August 10, when it is claimed she revoked the will. Mrs. Dougan, until shortly before the execution of her will, had enjoyed vigorous health and possessed a keen mind. In November, 1933, she was confined for a short period in a hospital, undergoing

observation on account of an ailment of her heart. After Mrs. Dougan's discharge from the hospital she returned to her home and apparently resumed her daily activities until the cerebral hemorrhage of July 13. The respondent admits that this cerebral hemorrhage affected his mother's throat to such an extent that it was difficult for her to express herself, and that it also partially disabled her left hand. He contends that whatever other effect the stroke may have had quickly disappeared. He concedes that the second stroke, which occurred on August 3, rendered his mother unconscious for a few hours, but claims that in a day or so its ill effects had disappeared. He admits that her inability to articulate clearly and to fully use her left hand remained unchanged. The proponents contend that the stroke of July 13 not only affected Mrs. Dougan's vocal organs and her left hand but also affected her mind, and insist that from that day she lacked testamentary capacity. They offered evidence showing that no one understood her after July 14; that at mealtime others had to feed her; that she could not write; that she was incapable of entertaining a thought longer than momentarily; that in many instances she could not recognize her friends; that she purposelessly packed and unpacked her belongings; that she became careless in her attire; that she arose from her bed after retiring for the night and walked about her room at late hours of the night; that preparatory to taking a bath she was unable to distinguish the hot from the cold water; and that generally she, being left-handed, could hold neither a pen nor other object in her left hand. Some of these witnesses expressed the opinion that she was wholly unable to transact any business whatever after the first stroke and until her death.

We shall now consider proponents' witnesses, eight in number. One of them is Mr. Wheelock, the afore-mentioned attorney, whom we deem an honorable member of the bar. He saw Mrs. Dougan only once (August 20) in the period of July 14 to the time of her death. He refused to testify that she lacked testamentary capacity. After her departure from his office he prepared a new will for her. Before she had left he asked her to return the following day. During the course of the night of August 20 she suffered the final stroke which, a few days later, resulted in her death. Not knowing of this unfortunate development, Mr. Wheelock inquired of the Sheeleys on August 21 why Mrs. Dougan had not returned to his office to keep the appointment. The will he prepared departed in two minor details from the Sheeley draft. He testified that he prepared the new will based upon the Sheeley draft and the information he was able to glean from Mrs. Dougan during the two-hour conference. He swore that she could not express herself in an understandable manner and could not write legibly. He declared that she manifested her wishes "by a nod or some mumbling sounds", adding that "it was too pitiful a sight" to fully describe. He testified that "I was very doubtful of her capacity to make a will" and that he discussed the situation with his associates. The instrument he produced was not a preliminary draft, but was obviously prepared for execution. The fact that he, as an experienced and careful attorney, prepared the instrument, we believe is a significant circumstance. Of the proponents' witnesses four are beneficiaries of the will: Mrs. Mills, Mr. Lehman, Arnold Loesel and Mrs. MacDonough.

Mrs. Mills came from Seattle immediately following Mrs. Dougan's stroke of July 13, and remained with her

as a companion for the ensuing three weeks. She testified that upon her arrival Mrs. Dougan recognized her and gave her a warm embrace. She swore that Mrs. Dougan gave her a check to cash so that money would be on hand with which to meet current expenses. She testified, as did also Mr. Lehman, that the latter, at Mrs. Dougan's request, struck from the will the MacDonough bequest. She testified that after this cancellation had been made Mrs. Dougan carefully put the will away. While this witness swore that Mrs. Dougan could neither talk nor write during this period of three weeks, she mentioned an instance or two when Mrs. Dougan was, apparently, holding telephone conversations. Mrs. Mills returned to Seattle August 10 after an altercation had taken place between her and Mrs. Dougan, in the course of which a chair and, possibly, a vase were broken. Mr. Lehman had virtually assumed charge of Mrs. Dougan's affairs and person after July 14 and remained in charge until the son's arrival August 11. He was sure that Mrs. Dougan recognized him when he entered the apartment July 14. He admitted that she made her way to his office. Although he described himself as "very hard of hearing", he swore that Mrs. Dougan could not talk understandably. He swore positively she could not write. He testified that he struck out the MacDonough bequest at Mrs. Dougan's direction about two weeks after the stroke of July 14, and that sometime after the stroke she gave him a quantity of jewelry, two checks and her bank book for safekeeping in his office. He admitted that within a few minutes of the son's arrival on August 11 she asked for the return of these valuables and at once went with him and the son to his office where the articles were returned. He testified that a few days later she demanded receipt in full for all

claims he had against her and a statement of the H. S. & D. Investment Company's financial condition for the preceding year. He complied with these demands.

Mrs. MacDonough entered Mrs. Dougan's apartment about 9 o'clock on the morning of July 14, pursuant to a telephone call from Mrs. Murrell, manager of the Envoy apartments, where Mrs. Dougan resided. She testified that when she arrived she found Mrs. Dougan staring blankly into space, unable to speak and, apparently, unconscious of the presence of others in the room. Upon Mrs. MacDonough's next visit Mrs. Dougan, according to this witness, "had a little book where she kept the addresses of her friends in, and she pointed to Helen Mills' name, and I said, 'You want me to write Helen Mills?' and she nodded, and I sent a note to Helen Mills telling her of Mrs. Dougan's illness". Mrs. MacDonough testified that on several later occasions Mrs. Dougan visited her at her (Mrs. MacDonough's) office, and that on one of these visits she invited Mrs. MacDonough to lunch by saying "You, me, lunch." After the lunch, according to Mrs. Mac-Donough, Mrs. Dougan invited her to her home by saying "You, me, home." She testified that on one of the occasions when Mrs. Dougan called at her office she expressed herself as distrustful of Mr. Lehman and was noticeably displeased with Mrs. Mills. Mr. Loesel was a janitor who belonged to the same religious sect of which Mrs. MacDonough was the leader. For some years he had occasionally helped Mrs. Dougan with chores about her home. Shortly after her first stroke she sent a message to him by a mutual friend, requesting that he do some work for her. We pause to observe that Mrs. Dougan apparently recalled her friends and their addresses.

The next witness whom we shall consider is Dr. Moore who was called by Mr. Lehman on July 14, to attend Mrs. Dougan. He had never seen her before. His services continued until the time of her death, but between August 3 and 21 he saw her only once and that was not professionally. Concerning the second attack which occurred August 3, he testified: "My notes show that I was called to see Mrs. Dougan because of another attack. This time was totally unconscious; recovered the next day; also phoned and was told that she had practically fully recovered so I really only saw her once that time." Referring to observations which he made at other times concerning Mrs. Dougan, the witness swore that she could not "even recognize any questions that were asked her. . . . Unable to even make any signs or writings on paper that were legible. . . . Never was able to understand what she tried to tell me, or if she attempted to say anything she never could say an audible word. I have tried several times to try to understand her and get her to write it on a paper which she was unable to do. . . . I probably imagined that she might have recognized me, but I couldn't swear to it." Another of the proponents' witnesses was Dr. Moore's office nurse. She saw Mrs. Dougan for a few minutes on August 17 while the latter was seated in the physician's outer office.

The remaining two witnesses are Mrs. Ora S. Hughes and her daughter-in-law, Mrs. J. R. Hughes. Both had been friends of Mrs. MacDonough for many years and through her had become acquainted with Mrs. Dougan. Mrs. J. R. Hughes, a nurse, saw Mrs. Dougan on the morning of July 14 when she entered the room with Mrs. MacDonough. She testified that Mrs. Dougan was gazing into space, was unconscious

of the presence of others in the room until she (Mrs. Hughes) pressed her hand. Even then Mrs. Dougan seemed unaware that Mrs. Hughes was speaking to her. She did not see Mrs. Dougan again until August 21. Mrs. Ora Hughes did not see Mrs. Dougan after this illness had overtaken her until the evening of August 10. At that time Mrs. Dougan's daughter-in-law had arrived. This witness testified that Mrs. Dougan was then "very excitable; she was in bed and she just tried to talk all the time, but I couldn't understand anything except 'she said' and 'he said' just back and forth and back and forth; and then she would get out of bed and 'she says' this, that and the other and everything." "Q. For instance? A. About the chairs. There was a chair broken there. . . . And she claimed in her way that there had been something else." It will be recalled that on August 10 an unfortunate altercation had occurred between Mrs. Mills and Mrs. Dougan which resulted in the breaking of a chair, and in which a vase also played a part.

This will have to suffice as a review of proponents' witnesses. Lest we be accused of having overlooked items concerning which these witnesses spoke, and which have not been specifically mentioned, we add that the above review is not intended as a complete narrative of the testimony of these witnesses. In a preceding paragraph we gave a summary of the testimony of all of the proponents' witnesses.

The following of the proponents' witnesses expressed adverse opinions concerning Mrs. Dougan's mentality: Dr. Moore, Mr. Lehman, Mr. Loesel, Mrs. Mills, Mrs. MacDonough and Mrs. Ora Hughes. Dr. Moore testified: "I think that I could very safely say that at the time that I have seen her that she was unable to do anything pertaining to her business, un-

able to carry on a conversation, unable to make herself audible, and unable to even make any signs or writings on paper that were legible.'' Mr. Lehman testified that after July 14 ''she didn't attempt any business at all after that; she made no attempt at doing any business''. He was then asked, ''What is your opinion as to her ability to have formulated a plan and carried it out if she had attempted it?'' and replied, ''My opinion is that she would not have been able''. To an inquiry whether she possessed ability to have made the marks which appear upon the will, he replied, ''I am sure she could not have drawn straight, accurate lines,—positive of that''. Mr. Loesel expressed the opinion that at the times when he saw Mrs. Dougan she was not capable of forming a plan concerning the disposition of her property and carrying it into execution ''because her mind seemed to drift''. Mrs. Mills expressed the opinion that during the three weeks that she was with Mrs. Dougan the latter was incapable of exercising judgment, reason or deliberation, and likewise incapable of formulating a plan for the disposition of her property. Mrs. MacDonough, referring to Mrs. Dougan, swore: ''I would say she couldn't reason. . . . If she wanted to think or she wanted to write something she would get the thought and then she would go to put it down and then it was gone; the idea was gone.'' She added that after the first stroke Mrs. Dougan was unable to exercise judgment, reason or discretion and expressed the belief that she was unable to formulate a plan for the disposition of her property. From the testimony of Mrs. Ora Hughes, we quote: ''I would consider that Mrs. Dougan was not in possession of all of her faculties; so therefore, she could not carry out any plans.'' We deem it unnecessary to review the testimony of proponents'

witness, Dr. Robert E. Smith. He never saw Mrs. Dougan; nor did Mr. Joseph Hall, also called by the proponents.

The respondent, and 19 witnesses produced by himself, testified concerning the activities of Mrs. Dougan about the time of August 10. Apart from the respondent and his wife, and Frieda Rahn, these witnesses appear to have had no personal interest in the controversy. Frieda Rahn was a beneficiary of the will and, therefore, in supporting the respondent's contentions, she was testifying against her own interest. Further, since she was an employee of the Medical Dental building of which Mr. Lehman was the manager, she was testifying against the interests of her superior; in fact, Mr. Lehman took her to task for so doing. Each of these witnesses had seen Mrs. Dougan about August 10. Of the 20 witnesses who had seen her during the contested period of time, all, except five, had transacted some item of business with her. The five whom we except are Frieda Rahn, Gustav Rahn, Clayton Oehler, Mr. and Mrs. Sheeley. Frieda Rahn saw Mrs. Dougan frequently between July 14 and the day of her death. These visits were of a purely social nature and occurred at Mrs. Dougan's apartment or at the Medical Dental building. Gustav Rahn, father of Frieda, had been a friend and an employee of Mr. Dougan during the last years of the latter's lifetime. He had known Mrs. Dougan as a friend for several years. He testified that about August 8 Dr. Chandler, a friend of Mrs. Dougan, drove her to the Rahn home and that he and his wife visited with Mrs. Dougan at the curb for several minutes. Clayton Oehler and Mrs. Dougan had been friends for many years and on August 9 or 10 exchanged some pleasantries and reminiscences in the lobby of

the Ramapo hotel. Mrs. Dougan called at the apartment of Mr. and Mrs. Sheeley about six times commencing on August 8 or 9 and ending on August 20. Some of these visits lasted for more than two hours, and one of them included a trip down town on foot to the office of Mr. Wheelock. These visits were partially of a social nature, but it was during the course of them that Mrs. Dougan made the aforementioned marks upon her will, uttered the alleged words of revocation, and gave Mr. Sheeley the information that enabled him to prepare the draft for a new will. The remaining witnesses testified concerning a variety of transactions which we shall now briefly review. A. M. Wright and Thomas F. Dunn are vice president and assistant cashier, respectively, of the United States National Bank of Portland. They testified that on August 17, 1934, Mrs. Dougan called at their institution and opened an account, depositing at the time $1,800. Benjamin H. Baker is the manager of the safety deposit vaults of the United States National Bank. He testified that on August 11, 13, 15 and 17, Mrs. Dougan visited his department. In each instance, according to his testimony, she signed her name to the identification card and then entered the vault. These three officials produced the five signatures which she wrote on those occasions and four which she had written prior to her three strokes. The five signatures written at the contested period compare very favorably with the four others. Yola Keith and Gladys Bitting are clerks at a Portland store, and about the middle of August displayed and sold to Mrs. Dougan a handbag. Estelle Loveland is a clerk at another Portland store who waited upon Mrs. Dougan in August when the latter desired to purchase a Washington bag. Dr. William Chandler was a chiropractic physician who had known

the Dougans for many years in the capacity of physician as well as friend. He saw Mrs. Dougan several times in the period between July 14 and the time of her death. He drove her in his car; she ate dinner at his home and he gave her professional treatment. She directed him as he drove her to the Rahn home—he had never been there before. She discussed with him various matters during these visits, including the revocation of her will, her affection for her son and her desire to write a new will. Mrs. Lillienthal and Mrs. Hayes were clerks at a Portland store who fitted and sold a corset to Mrs. Dougan on August 13. Miss Daly operated a doctors' exchange in the Medical Dental building, and saw Mrs. Dougan frequently. On August 20 "she came in very happy" and, in accordance with her custom, requested Miss Daly to call a cab, giving her the telephone number. At the same time she introduced her son who accompanied her. Lloyd Jaeger, a hotel manager, showed Mrs. Dougan a suite of rooms in the establishment which he managed when she expressed an interest as a prospective tenant. Mrs. J. W. McNeff, who lived in the Ambassador apartments, showed Mrs. Dougan her apartment August 20 when she expressed an intention of moving to that building. Mrs. Elizabeth Murrell, manager of the Envoy apartments, where Mrs. Dougan was living, testified that on the morning of July 14, pursuant to a telephone call from Mrs. Dougan, she called at her apartment. She swore that when she reached the apartment Mrs. Dougan unlocked and opened the door and "seemed perfectly natural and normal only that she could not talk; she was dressed very neatly and her hair arranged well". Mrs. Dougan then pointed to the name of Virginia MacDonough in an address book, signifying a request that Mrs. Murrell telephone to her. This was

done. She testified that thereafter she saw Mrs. Dougan on several other occasions until the time of her death, stating that in each instance she was normal, apart from her difficulty in articulating. Upon August 2 or 3 she was summoned to Mrs. Dougan's apartment by Mrs. Mills. Upon arriving there, according to her testimony, she found that Mr. Lehman was insisting that Mrs. Dougan sign a check for the apartment rent. Mrs. Dougan had refused to sign the check because payment, according to her, would not be due until August 7, and, in substantiation of her contention, had produced and shown to Mr. Lehman her copy of the lease. Mrs. Murrell testified that ''I just said to them that I thought it was no use to worry her with the rent at that time; it wasn't due''. This, apparently, settled the difficulty.

In some of the above-mentioned instances Mrs. Dougan was accompanied by her son and her daughter-in-law, but in each instance the witness swore that the business was transacted by Mrs. Dougan. Mr. Dunn testified that, since Mrs. Dougan was transferring a balance of an undetermined amount from another bank to his bank, the transaction was of a difficult nature and required that a messenger be sent to the other bank. He added that Mrs. Dougan's son helped him to explain its details to her. Each of these witnesses testified that Mrs. Dougan appeared to be fully capable of transacting the business in which she was engaged except that she had difficulty in articulating. Each swore that by giving careful attention, especially by watching her lip movement, they had no serious difficulty in understanding her. Some of them testified concerning keen observations which Mrs. Dougan made while transacting the item of business and which they thought indicated alertness. Dr. Chandler testified that she

experienced no difficulty in eating while at his home. All but two of these witnesses (Miss Bitting and Miss Keith) had known Mrs. Dougan for periods ranging from a few months to many years. The daughter-in-law of Mrs. Dougan arrived in Portland on August 10 and from the evening of that day to the time of Mrs. Dougan's death resided at her apartment, as did her husband also after his arrival on August 11. Both of these persons testified concerning their observations. Each swore that Mrs. Dougan readily recognized them and that the only disability from which she suffered concerned her articulation and the effective use of her left hand. The son testified that on one occasion when he accompanied his mother to the safety deposit vault she requested him to make an inventory of the contents of her box, and added that, in her presence, he did so. The son and his wife testified that Mrs. Dougan had no trouble in eating whether at home or in restaurants. They swore that she gave the orders to the waitresses.

Besides mentioning the above characteristics displayed by Mrs. Dougan during her illness, many of the witnesses testified that at times she appeared to be nervous, excited or irritated. The proponents' witnesses stressed these tendencies more than did the respondent's. The fact that others could not readily understand her provoked and embarrassed her; in fact, according to Mr. Sheeley, she sought him out rather than go, in the first instance, to an attorney because she thought he would be more patient with her. The partial disability of her left hand, which at times caused her to drop a pencil or other object, was also a source of annoyance to her.

We believe that the witnesses for the respondent have given a reliable account of the activities of this woman at the crucial time, and that their testimony

affords a fair basis for appraising her mental capacity. Very likely many, if not all, of the incidents occurred which the proponents' witnesses described. But we believe that they selected incidents which occurred while the most severe effects of the strokes were still present or when Mrs. Dougan was suffering from nervous strain such as resulted from her altercation with Mrs. Mills. According to the evidence, Mrs. Dougan had become afraid that Mrs. Mills and Mr. Lehman were endeavoring to unduly restrain her and that they had designs upon her property. There is evidence that even Mrs. MacDonough and Mrs. Ora Hughes shared in this belief. Mrs. Dougan's belief that such was true may have had something to do with the excitability which she displayed when Mr. Lehman and Mrs. Mills were in her apartment. At any rate, after Mrs. Mills had left Portland and Mr. Lehman had returned her possessions and had discontinued his frequent visits, Mrs. Dougan seemed to become more calm. Without doubt, she was a sick person, possibly more seriously than she herself realized. However, at the crucial time she went about town unassisted, sought out at least one of her friends, the Rahn family, recognized her acquaintances, bought articles that she needed, readily recognized her son and daughter-in-law when they arrived, knew the property which she possessed, opened a sizable bank account, knew of her will, recalled that Mrs. MacDonough already had the jewelry mentioned in her will, and that, therefore, the bequest should be cancelled, knew that Mr. Lehman had property belonging to her, was able to attend to the matter of securing its return, thought of the necessity of obtaining a receipt in full from one whom she believed might later present a claim against her estate, was able to give Mr. Sheeley detailed directions about a new will, and still

later was able to make known to Mr. Wheelock her wishes about a new will so that he prepared one for her.

■ As is manifest, the same degree of mental capacity is necessary to revoke a will as to make one: Page on Wills (2d Ed.), § 422, and Alexander, Commentaries on Wills, § 518. A person possesses sufficient capacity to make a will when he understands the nature of the act in which he is engaged, knows the kind and extent of his property and is able to bring before his mind the persons who properly constitute the objects of his bounty: *Morley v. Silverton Hospital,* 138 Or. 75 (5 P. (2d) 92).

■ It is evident from the testimony of Mr. Lehman and Mrs. Mills that at the crucial time Mrs. Dougan knew that she had a will. It is likewise evident from their testimony that she was familiar with at least one of its paragraphs. After the MacDonough bequest was struck out Mrs. Dougan carefully put the will away. The testimony of the Sheeleys indicates that at the time the alleged acts of revocation occurred Mrs. Dougan reviewed, paragraph by paragraph, the entire instrument, commenting as she proceeded. We are satisfied that Mrs. Dougan possessed sufficient mentality to comprehend the nature of a will and to understand the contents of the one she had signed. At the time of the alleged revocation Mrs. Dougan recalled her son and daughter-in-law and had before her mind the circumstances affecting them. If the testimony of her son is believed, Mrs. Dougan spoke to him about the middle of August of her earnest desire that her deceased husband's nephew, James Siberling, and the latter's wife, should receive a bequest. So far as the record discloses, the son, the daughter-in-law, and the nephew just mentioned are the only ones who could be deemed relatives of Mrs. Dougan. The record also indicates that in the

·month of August Mrs. Dougan was visiting with many of her friends and readily recognized them. These relatives and friends and those mentioned in her will, so far as we are able to determine, constituted the natural objects of her bounty. The proponents mention no others. As she reviewed with Mr. Sheeley her old will and gave him the data for the new one, she discussed in turn each individual mentioned in those two instruments. From these circumstances, we believe the conclusion is warranted that she had in mind those whom a mentally capable testator should deem the objects of his bounty. At the crucial time she transferred from one bank to another a large sum of money. When the rent difficulty, mentioned in a preceding paragraph, arose she assured Mr. Lehman that she had sufficient money in her safety deposit box to discharge the rent when it became due. These circumstances indicate that she knew of the cash which she possessed. On one occasion she had her son make an inventory of the securities contained in her safety deposit box. To a friend she mentioned an item of property which she owned in Portland. At another time she asked Mr. Lehman for a financial statement of the Medical Dental building and received it. With one or two others she discussed the present condition of real property. As already indicated, she demanded and received from Mr. Lehman a large quantity of valuable jewelry which she owned. These circumstances indicate that she was familiar with the nature and extent of the property which she possessed. It is our belief that on August 10, 1934, and thereabouts Mrs. Dougan possessed testamentary capacity sufficient to enable her effectually to revoke her will.

■ The next issue is, did Mrs. Dougan, on August 10, intend to revoke her will and carry her purpose into

execution by doing the necessary acts and uttering the needed words. Sections 9-904, Oregon Code 1930, states:

"A written will cannot be revoked or altered otherwise than by another written will * * * or unless the will be burnt, torn, cancelled, obliterated or destroyed, with the intent and purpose of revoking the same * * *."

The respondent claims that Mrs. Dougan revoked her will by obliterating its lines, and by declaring that it was no longer her will. It will be observed from the provisions of the statute just mentioned that before her purpose could be effected it was necessary that she cancel the will and that her act be accompanied with an intent upon her part "of revoking the same".

We have already described to some extent the marks which Mrs. Dougan made upon the will. The instrument, apart from the attestation clause, consists of 22 paragraphs. Over 17 of them she made pen or pencil marks. The marks which she made over 16 of these paragraphs are sufficiently heavy and sufficient in number and character that a reasonable mind could readily infer that Mrs. Dougan intended to strike out those paragraphs. The other paragraph, entitled "Seventh" in the will, is marked with light pencil marks which Mr. Sheeley swore were made by Mrs. Dougan.

The five paragraphs which Mrs. Dougan did not obliterate are (1) the prefatory paragraph; (2) a paragraph directing that her debts be paid; (3) a paragraph containing a bequest in favor of Josie Chappelle; (4) a paragraph containing a bequest in favor of Margaret Liddell; and (5) a paragraph containing a bequest in favor of Arnold Loesel. As filed, every portion of the will, with the exception of the first two paragraphs, the signature, and the attestation clause, contain marks

of some kind. Some of these additional marks were made by Mr. Sheeley while Mrs. Dougan was giving instructions about the new draft, others by Mr. Wheelock while he was conferring with her or when he was preparing the new will.

■ Under statutes similar to ours the courts hold that marks made upon a will by its author are effective as a revocation thereof, regardless of their depth, faintness or other characteristics, if they were placed there for the purpose of cancelling the will. Their efficacy is not dependent upon their kind, but upon proof that the will's author employed them as an indication of the fact that he had revoked the will. We quote from *Noesen v. Erkenswick*, 298 Ill. 231 (131 N. E. 622):

"Surely no one can be found who would say that a postage stamp is not canceled because he can still see that it is a postage stamp, nor that a provision of any document is not canceled by drawing a line through it with pen and ink although the words can still be read, nor that any banker, whatever he might think of other methods of cancellation, would pay a check canceled by writing across the face merely because he could see what the check was before cancellation. It would be going far beyond the statute to say that a will is not canceled unless the words are erased or obliterated so that the nature of the will before cancellation or its provisions, cannot be discovered."

The following is quoted from *Estate of Olmstead*, 122 Cal. 224 (54 P. 745):

"Generally, it may be said that, if the intent to revoke clearly appears, a slight act within the statute will be deemed sufficient."

From *Glass v. Scott*, 14 Colo. App. 377 (60 P. 186), we quote:

"Neither our statute nor that of Charles, nor any other statute of any state to which our attention has

been directed, attempts to declare what shall amount to cancellation or what shall amount to obliteration. The words are not technical and the legislatures must be presumed to have used them in their ordinary sense and according to their ordinary signification. It serves no useful purpose and adds nothing to the strength of the argument to enter into a discussion respecting the derivation and original signification of the words or of the Latin words from which they were constructed, whereby the result has been incorporated into our language. Long before the statutes or any of them were passed, these words had passed into common use and had acquired an accepted signification which has continued to the present. An obliteration or a cancellation would be either one or the other, and effective as such if done with an intent to destroy an instrument and render it ineffectual for the purposes for which it was originally put into circulation. It has been adjudged that this cancellation or obliteration may be effected by words written across the instrument as 'obliterated' or 'canceled'. The end may be equally well accomplished by any erasure which shall be partial or complete. It may be done by drawing the pen through the words.''

From 68 C. J., Wills, p. 818, § 513, we quote:

''To what extent a cancellation, obliteration, or destruction of the instrument must extend to be effectually revocatory cannot be stated with any great degree of particularity, and the sufficiency of the acts must depend upon the circumstances of each particular case, but if any one of the acts prescribed by statute are performed in the slightest manner with intent to revoke it will be an effectual revocation.''

To the same effect see *Estate of Wikman*, 148 Cal. 642 (84 P. 212) and *In re Alger's Will*, 38 Misc. Rep. 143 (77 N. Y. Sup. 166).

We are satisfied that the marks made upon the will by Mrs. Dougan are sufficient in extent and character to effect the revocation of that instrument if she placed

them there pursuant to an intent to revoke the entire will.

■ We shall now consider the evidence which indicates the intent with which the marks were placed upon the will. It will be recalled that Mrs. Dougan made them on the afternoon of August 10. In making this statement, we have not overlooked the fact that Mr. Sheeley testified that Mrs. Dougan made an occasional mark after that day, but those additional marks were merely supplementary to marks already made; or were made while Mrs. Dougan was indicating with pen or pencil a paragraph that she was then discussing. Further, it was on the 10th that she made her principal declarations that the instrument was revoked and was no longer her will. It will be recalled that it was also on the 10th that she signified great dissatisfaction with Mr. Lehman and Mrs. Mills, expressing a belief that they had designs upon her wealth. Her son did not reach Portland until August 11, and it is very clear that for a few years preceding his arrival he had had no communication with his mother. Hence, we are convinced that he had nothing whatever to do with his mother's change of attitude toward Mrs. Mills and Mr. Lehman. Further indicative of Mrs. Dougan's suspicions concerning Mr. Lehman is the circumstance that promptly upon the arrival of the son the mother demanded from Mr. Lehman the return of her jewelry, checks and bank book. It is clear that the son was unaware of the nature of the mission upon which his mother, Mr. Lehman and himself were bent when the three started for Mr. Lehman's office to secure the return of the valuables. We have already mentioned some of the reasons which possibly changed Mrs. Dougan's attitude toward Mr. Lehman and Mrs. Mills. In addition, we have the fact that she told Mr. Sheeley,

according to the latter, that "Mr. Lehman was manager of the business, and he was getting a good salary and recently had had his salary raised by her aid, and that he had plenty there, and she wanted Roy to get everything". According to the same witness, Mrs. Dougan also expressed a belief when she struck out the bequest for Mrs. Mills that "she had plenty". Both Mr. and Mrs. Sheeley testified that on the 10th of August Mrs. Dougan, while looking at some photographs of the Sheeley children, praised the Sheeleys for their affection for their children and avowed love for her son. In her safety deposit box three childhood photographs of her son were found after her death. According to the testimony of Mr. Lehman, Mrs. Mills and Mrs. MacDonough, the mother had expressed herself in embittered terms concerning the son. Her feeling towards him, however, had not caused her to lose affection for his wife. The circumstance to which these three witnesses pointed as the cause of the embitterment—an unpleasantry that had occurred three years previously —appears to us as a very slight foundation for bitter feelings. But we are satisfied that an estrangement existed. Mother and son, however, had much in common which should have caused affection. They looked alike and displayed the same characteristics. Moreover, when the son was eight years of age and the mother, upon desertion by her husband, was in impoverished circumstances, the boy sold newspapers upon the streets of San Francisco and thereby supplemented his mother's slender earnings as a dressmaker. Throughout his seven years in school he continuously worked in his spare moments, giving his mother whatever he earned. Then school ended for him. After having worked for a short time for the Union Oil Company his mother, according to the son, secured employment for him with

a distillery firm. The son frankly admitted that he did not entirely cease his connection with the liquor business when prohibition was in effect, but continued to supply some of his customers from time to time although at the same time he worked at other employment. Some of the proponents' witnesses testified that Mrs. Dougan denounced her son to them as a bootlegger. If such was her feeling she was not entirely free from guilt. She it was who paved the way to that end when she placed the boy in a distiller's employ. But, whatever may be the truth of this matter, it is a fact that after the son had arrived in Portland not a cross word passed between him and his mother. To the contrary, she manifested pleasure in his company. Certainly the attitude she displayed towards the son after his arrival and until the final stroke affords no basis for any inference that she had ever been embittered towards him. This will have to suffice as a review of the evidence which indicates Mrs. Dougan's changed attitude towards Mrs. Mills, Mr. Lehman and the respondent.

According to the testimony of the Sheeleys, Mrs. Dougan, after having made the numerous obliterations upon the will, stated more than once that the instrument was now revoked, cancelled and no longer her will. She experienced difficulty in articulating the letter "k" in the word "revoke", and her difficulty with the word emphasized her expression. We quote from the testimony of Mr. Sheeley: "For instance, when she was trying to say that she had revoked her will, she said the word 'revoe' and she said, 'You, an attorney, know what I mean'. Now, that is the way Mrs. Dougan talked, and she could talk that way very plainly, and I don't think there was any occasion why I could not understand what she was saying. I asked her, 'Do you mean "revoked"?' and she says,

'Yes; it is cancelled; they mean the same thing.' Now, the words 'It is cancelled; they mean the same thing' she said herself; those are her exact words." Mrs. Sheeley testified that after Mrs. Dougan had had difficulty in pronouncing the word "revoke" she undertook to write the word. We quote from her testimony: "The very first word that she wrote or she tried to write to make us understand, she took a piece of paper and she wrote 'R-e' and she couldn't connect her syllables,—she wrote 'R-e-v-o' and then later—but she wrote that two or three times; now, I am not saying three or two, or two and a half, and I don't remember just exactly how many, but she wrote it more than once —two or three or four or five times; and finally she put a 'k' on it, and then she said 'revo'; I didn't know what she meant, because I didn't know anything about wills, and she turned to me and she says, 'Revo, that means out; it is cancel'; she wouldn't put her suffix on; she didn't say 'cancelled'; she said 'cancel'; she said 'that's out now.' "

At the conclusion of this conference, which occurred on August 10, Mrs. Dougan returned to the Sheeley apartment several times to confer with Mr. Sheeley about the new will. According to the testimony, she stated at virtually all of these conferences that the old will had been revoked and no longer represented her wishes. In fact, when these three people started for Mr. Wheelock's office on the 20th Mrs. Dougan cast the old instrument aside, stating it was no longer her will and could see no reason for taking it along until Mr. Sheeley explained that it might be helpful to Mr. Wheelock in the preparation of the contemplated will. The testimony of the Sheeleys concerning revocation is uncontradicted and its cogency is questioned by only an occasional circumstance developed by the

proponents' witnesses. We have compared the Sheeleys' testimony with these alleged circumstances, but are brought to the conviction that they spoke the truth. Further, their testimony is, to some extent, substantiated by testimony given by Dr. Chandler wherein he related declarations made by Mrs. Dougan expressing her dissatisfaction with her will. Mr. Wheelock testified that Mrs. Dougan did not tell him that she had revoked her will. He, however, swore that she handed him the badly mutilated will and that he himself made marks and notations upon it. It seems fair to infer that neither he nor Mr. Sheeley would have written upon the document if they believed that it still was a testamentary document.

Without reviewing the evidence further, we express our belief that on August 10, 1934, Mrs. Dougan intended to revoke her will, and that for the purpose of doing so she made obliterations upon the instrument and then announced its revocation. Possibly, it is unnecessary to add that, in our opinion, she intended to and did revoke the entire instrument.

■ The proponents contend that if Mrs. Dougan revoked her will its revocation was conditioned upon the effectiveness of the new will which Mr. Wheelock was preparing for her execution. The principal differences between the two documents are the following: The will gave her son items worth about $800; the draft made the son residuary legatee; the draft increased the bequest to James Siberling from $4,000 to $5,000 and omitted the bequests to Virginia Williams, wife of the son, to Gladyz Rodemacher, Virginia MacDonough, Rose Chandler and Margaret Sears. Each document contained exactly the same bequests for Josie Chappelle, Angie Landers, Frieda Rahn, Margaret Liddell, Arnold Loesel and Muriel Rodemacher. Each set up a trust for

Victoria Miller and Esther Miller. The obliterated will appointed H. H. Lehman trustee, while the draft appointed the son trustee. The will contained a conditional bequest for the Pisgah Home of $500; the draft reduced the amount to $200. The will, besides bequeathing to Helen Mills all of Mrs. Dougan's personal effects, made her and Mr. Lehman residuary legatees. The new instrument eliminated these persons entirely as beneficiaries. The will nominated Mr. Lehman as executor; the draft named Claude Sheeley.

In support of their contention, the proponents cite *Flanders v. White,* 142 Or. 375 (18 P. (2d) 823); *Thomas v. Thomas,* 76 Minn. 237 (79 N. W. 104, 77 Am. St. Rep. 639); *Appeal of Strong,* 79 Conn. 123 (63 Atl. 1089, 6 L. R. A. (N. S.) 1107, 118 Am. St. Rep. 138); *In re Marvin's Will,* 172 Wis. 457 (179 N. W. 508); Warren, Dependent Relative Revocation, 33 Harv. Law Rev. 337, and annotation 62 A. L. R. 1367. The splendid discussion of the doctrine of dependent relative revocation appearing in 33 Harvard Law Review 337, and the comprehensive annotation printed in 62 A. L. R. 1367, received consideration by this court in *Flanders v. White,* supra. In the four decisions upon which the proponents rely the courts in each instance found that as a matter of fact the decedent did not intend to die intestate. In *Flanders v. White,* the deceased, after discovering that it would cost $15,000 to administer his estate in the probate court, devised a system of accounts which he believed would enable his estate to be distributed without cost. He then destroyed his will. The account book and the will favored the same persons and set forth substantially the same amounts. After reviewing the evidence, we expressed convictions that the deceased "never intended to die intestate" and that a mistaken belief

that the account book was a lawful method of effecting a distribution of his estate had induced him to destroy his will. We carefully pointed out that intestacy would have defeated the deceased's purposes for it would have given his favorite niece, principal beneficiary of the will and of the account book, nothing, but would have given large rewards to individuals unmentioned in either the will or the account book.

In *Thomas v. Thomas*, supra, the testator had obliterated from his will the name of one of his sons, Edward, and substituted in its place the name of the son's wife, Abbie. He did not republish the document. The court found that the testator would not have revoked the devise had he not believed that the substituted one to the wife was lawful. It resorted to the fiction that the revocation was conditional and that, hence, the devise to the son was not stricken.

In *In re Marvin's Will*, supra, the testator had four grandchildren and by her will bequeathed her entire estate to one of them, Earl. Later she made pencil marks across this bequest and then, below the attestation clause, wrote a statement that the entire estate was left to the Orphans' Home. There were no witnesses to this attempted bequest. The court stated that there was no evidence indicating that the obliteration and the addition of the attempted bequest to the Home were written at different times. It stated:

"The fact that she deliberately made the original will and leaving the writing in the form it was in when she died indicates pretty clearly that she at all times from the date of the making of the will intended to dispose of her property by this will. The parol proof received by the court tends to support the conclusion that from the date of the making of this will up to her death she believed she had a will. The rational conclusion is that the testatrix entertained the belief

that canceling the first paragraph of the will as she did and writing the clause in ink below the will as originally made operated to change her testamentary bequest from Earl Johnson to the Orphans' Home.''

In other words, it found that she was laboring under a mistake when she cancelled the bequest to her grandson. It affirmed the decree of the lower court which admitted to probate the will in its former condition.

In *Appeal of Strong*, supra, the facts were that Miss Elizabeth Strong was one of the beneficiaries of a trust with power to dispose of her portion of the income and her share of the principal by will. In 1897 she made a will whereby she gave her portion of the income to her father for life, remainder to her mother for life, remainder to her sister, the appellant, for life, and remainder to her brother, in fee. Upon her death it was discovered that she had torn her will in two and had written upon its first page ''Superseded by a written one''. In the same envelope in which this document was found there was also a draft of a will which was unsigned. It gave the income of the trust to her brother. Her relationship with the appellant had continued affectionate until death. The trust provided that if Miss Strong did not exercise the power of appointment the income would be paid to the trustor's nephews and nieces. In holding that the will had not been revoked the court expressed the belief that when she tore the instrument and wrote upon it ''Superseded by a written one'' she was acting under a mistaken belief that the unsigned draft had testamentary effect. We quote from the decision:

''Here she was acting under a mistake, and one apparent from the words used to effect the cancellation. This mistake was plainly the sole cause for the revocation which she intended to declare. Unless she exer-

cised the power of disposition given her by Mr. Harris, the fund which was subject to it would go to strangers to her blood.''

It will be observed that in all four of these decisions the court found that a mistake had caused the testator to commit the act of alleged revocation, cancellation or alteration, and that the court found from the evidence before it that the deceased preferred the probate of the testamentary document to intestacy. In *Flanders v. White,* supra, we spoke of the doctrine of dependent revocation as one of presumed intentions. In each of these four instances the presumed intention of the decedent was not overcome by the proof, but, to the contrary, was fortified by the proof.

In *In re Marvin's Will,* supra, the court said:

''If a testator cancels or destroys a will with the present intention of making new disposition of his property, and the proposed new disposition fails to be carried into effect, the presumption in favor of a revocation by the canceling is repelled, and the will stands as originally made.''

Similar statements do not appear in the other decisions reviewed above.

In *McIntyre v. McIntyre,* 120 Ga. 67 (47 S. E. 501, 1 Ann. Cas. 606, 102 Am. St. Rep. 71), the facts were that sometime after the decedent had executed his will he obliterated parts of it and over other parts wrote new words. A witness testified that, during the last illness of the decedent, the latter stated: ''Willie, I have left a pencil memorandum of a will—it is not a will—but I was not able to finish (or complete) it; but I call upon Willie to carry out the provisions of this pencil memorandum.'' In holding that the trial court erred

when it deemed itself bound to find that the revocation was conditional, the supreme court declared:

"Under the operation of this doctrine it has been held that if a testator cancel or destroy a will, with a present intention to make a new will as a substitute for the old, and the new will is not made, or if made fails of effect for some reason, it will be presumed that the testator preferred the old will to an intestacy, and this testament will be given effect. We believe this doctrine to be sound, when properly understood and properly qualified. It is a doctrine of presumed intention, and has grown up as a result of an effort which courts always make to arrive at the real intention of the testator. Some of the cases appear to go to extreme lengths in the application of this doctrine, and seem to defeat the very intention at which they were seeking to arrive. The doctrine, as we understand it and are willing to apply it is this: The mere fact that the testator intended to make a new will, or made one which failed of effect, will not alone, in every case, prevent a cancellation or obliteration of a will from operating as a revocation. If it is clear that the cancellation and the making of the new will were parts of one scheme, and the revocation of the old will was so related to the making of the new as to be dependent upon it, then if the new will be not made, or if made is invalid, the old will, though canceled, should be given effect, if its contents can be ascertained in any legal way. But if the old will is once revoked,—if the act of revocation is completed, —as if the will be totally destroyed by burning and the like, or if any other act is done which evidences an unmistaken intention to revoke, though the will be not totally destroyed, the fact that the testator intended to make a new will, or made one which can not take effect, counts for nothing. In other words, evidence that the testator intended to make or did actually make a new will, which was inoperative, may throw light on the question of intention to revoke the old one, but it can never revive a will once completely revoked."

In *Banks v. Banks*, 65 Mo. 432, the decedent executed a will in 1865, and another in 1866 which made a materially different disposition of his property. Before executing the second will he burned the first. The lower court had instructed the jury that if decedent revoked the first in order to substitute the second "then in that case the destruction of the paper writing of date April 25, 1865, did not revoke it as a will unless the said other paper writing was valid and operative as a will". In holding that this statement was erroneous, the supreme court declared:

"* * * here the testator did not believe that the last will was completely executed, but intended subsequently to complete it by having it properly attested. It was not his opinion that by burning the first he thereby made good the second will. * * * Here the disposition which he proposed to make of his property by will of 1866, was substantially and materially different from that made by the will of 1865, clearly indicating that he was not satisfied with the original will. Here the testator had no impression or opinion that the last will was complete, but had a purpose subsequently to perfect it, and did so. He burned the will expressly to revoke it. We can not say that he would not have done so, if he had known that the second will would never be completed or probated."

In *In re Frothingham's Will*, 76 N. J. Eq. 331 (74 Atl. 471), the facts were that the deceased, while possessed of a large estate, executed his will which contained substantial bequests in addition to the sum bequeathed to his wife. Later, after his estate had shrunk to small size and he was concerned about means for the support of his wife after his death, he struck out all bequests except the one for his wife. After making some notations upon the will he had the scrivener, who had prepared the original instrument, put it in new

form. When the draft was handed to the decedent he was dissatisfied with one of its paragraphs and threw it into his desk, but placed the old will in his safe. The Orphans' court pointed out:

"There is nothing in the testator's declarations showing that the cancellation of the clauses in question was conditional, and not final. * * * He made no statement about executing a new will, or that would show any intention on his part to have these changes in his will become effective only on the happening of some other event, such as the execution of another will, and did direct the will, after the cancellation of these clauses, to be taken to the draftsman to have a draft made of it, omitting the canceled items; but there is nothing in the proofs but this act to indicate, in any way, an intention on the part of the testator to execute a new will, or to postpone giving effect to the changes made in his will, until a new will could be prepared and executed."

It held decedent was intestate. The decision above cited was *per curiam*. It adopted the comprehensive decision of the lower court, from which we have quoted.

Other decisions in harmony with the statement of the doctrine of dependent relative revocation found in the excerpt quoted from *McIntyre v. McIntyre* will be found in the comprehensive annotation in 62 A. L. R. 1408. Citations to other recent decisions appear in the annotations of 68 C. J., 799, § 483, and 28 R. C. L., Wills, 182, § 141. It will be observed from the facts before the court in *In re Marvin's Will*, supra, that it was unnecessary for the court to define the doctrine of dependent relative revocation in language as inclusive as it employed. The statement says nothing about a mistake, nor does it concern itself with the question whether a distribution of the decedent's estate, made pursuant to the questioned will, would be more likely to

give effect to decedent's purpose than a distribution pursuant to the laws of intestacy. Likewise, the court's statement displays no interest in the decedent's intent as revealed by his declarations, oral or written. Yet it will be observed that in all of the decisions above reviewed, including *In re Marvin's Will*, these additional items received grave consideration. The statement quoted from *In re Marvin's Will* is not in harmony with our discussion of the rule in *Flanders v. White*, supra; nor is it in harmony with the statement of the rule made by any other court. We prefer the statement of the rule set forth in *McIntyre v. McIntyre*, supra.

The doctrine of dependent relative revocation is largely based upon presumed intentions. In an endeavor to give effect to the deceased's intent, the doctrine construes his mistaken belief into a conditional revocation. In the present instance, Mrs. Dougan had no mistaken belief. Before she commenced her preparation of the new will she made her obliterations upon the old document and then, in no uncertain terms, declared that it was revoked, cancelled, and no longer represented her wishes. There were two transactions —not one. She was beset with a determination that Mr. Lehman and Mrs. Mills should receive nothing. She was equally determined that her son should have the items previously bequeathed to them. She contemplated the effects of intestacy by expressing to her son her very earnest desire that her husband's nephew, James Siberling, should receive the amount of cash mentioned in the will. There is no evidence that Mrs. Dougan believed, when she obliterated her will and declared it revoked, that some other document now constituted her testament. To probate the old will would do violence to the very purpose which the doctrine of dependent relative revocation seeks to serve.

It would defeat rather than serve the deceased's wishes. We are satisfied that Mrs. Dougan's revocation of her will was not a conditional nor a dependent one, but that it was absolute. We believe that she had two independent purposes: one to revoke her will, and the other to proceed thereafter, as occasion presented itself, with the preparation of a new will. We now quote from Page on Wills (2d Ed.) § 450:

"If testator intends to revoke his will and to be without one until a new one is executed, there is no mistake of law; or fact; the revocation is complete; and the will is revoked although testator does not make such subsequent will. * * * If testator intended such revocation to take effect at once, and intended to make a new will in the future, his failure to execute the new will will not operate to leave the original will in force."

We conclude that the revocation of the will was unconditional. It was absolute.

The above being our conclusions, it is unnecessary to discuss the burden of proof and the order of procedure where an obliterated document is offered for probate. We have not set forth a review of the testimony in its entirety, nor have we mentioned every witness by name. We have, however, considered everything that the proponents have discussed in their brief.

It follows from the above conclusions that the decree of the circuit court is affirmed.

CAMPBELL, C. J., and KELLY, BELT, BEAN, BAILEY, and RAND, JJ., concur.