Argued and submitted June 17, affirmed September 7, 1994

In the Matter of the Estate of
Alfred Cooper, Deceased.

Alberta WOOD,
Terrill Van Buren and Janice Tipton,
*Appellants,*

*v.*

Wade P. BETTIS,
Personal Representative of the
Estate of Alfred Cooper, Deceased,
*Respondent.*

(P92-10-19; CA A81243)

880 P2d 961

Robert L. Engle argued the cause for appellants. With him on the briefs was Engle & Schmidtman.

Ferris F. Boothe argued the cause and filed the brief for respondent.

Before Rossman, Presiding Judge, and De Muniz and Leeson, Judges.

De MUNIZ, J.

## De MUNIZ, J.

Appellants are Alberta Wood (Wood), the sister of the decedent, Alfred Cooper (Cooper), and her son and daughter.[1] They filed a petition seeking to revoke the probate of Cooper's will and codicil, executed in 1986 and 1988, contending that Cooper revoked the will on September 6, 1991. The trial court held that Cooper lacked the testamentary capacity to revoke his will. On *de novo* review, we affirm.

Cooper, who was 88 years old at his death on September 27, 1992, was residing in the West Linn Care Center, where he had been admitted on May 30, 1991. Beginning early in 1991, he had been hospitalized and in nursing homes, and, in February, a guardian and conservator had been appointed for him as a result of his mental and physical condition. He was admitted to the care center with a history of dementia and behavioral problems.

On August 31, 1991, Wood and her daughter visited Cooper at the care center. Wood testified that Cooper started talking about changing his will. Wood suggested that he contact his attorney. Wood was actually referring to Schwartz, a paralegal who had been appointed as Cooper's conservator. Wood testified that Cooper told her that he wanted Schwartz to come. Wood called Schwartz at her home on September 5. As a result of that conversation, Schwartz went to see decedent on September 6. During her interview with him, Cooper read his will, "some portions out loud and mumble[d] through some others," and then told Schwartz that that was not the way he wanted his will and that Schwartz should tear it up. When Schwartz said that she could not do that, Cooper did so. Immediately after Schwartz' interview with Cooper, she returned to the attorney's office where she was employed and made a memorandum of the visit.

Appellants argue that the trial court erred in holding that Cooper lacked the testamentary capacity to revoke his will. ORS 112.285 provides that "[a] will may be revoked by being burned, torn, canceled, obliterated or destroyed, with

---

[1] At the hearing on appellants' petition, respondent moved to dismiss Tipton and Van Buren, on the ground that they had no interest in Cooper's estate. The court allowed the motion, but the judgment does not reflect the dismissal and all three appeal.

the intent and purpose of the testator of revoking the will
* * *." The same degree of mental capacity is necessary to
revoke a will as to execute one. *In re Dougan's Estate*, 152 Or
235, 253, 53 P2d 511 (1936). In order to execute a will, the
testator must have sufficient mental capacity to understand
the nature of the business in which he is engaged, know the
kind and extent of his property and be able to bring to mind
the persons who are properly the objects of his bounty. *In re
Bond's Estate*, 172 Or 509, 519, 143 P2d 244 (1943); *see also
In re Provolt's Estate*, 175 Or 128, 133, 151 P2d 736 (1944).
When a guardian has been appointed because of the testator's
mental capacity, a rebuttable presumption of a lack of testa-
mentary capacity arises. *Ames' Will*, 40 Or 495, 67 P 737
(1902); *Gentry J. Briggs,* 32 Or App 45, 573 P2d 322, *rev den*
282 Or 189 (1978). Evidence relative to the mental condition
of the testator before and after the execution of a will is
admissible to determine mental state at the time of execution
of the will. *In re Provolt's Estate, supra,* 175 Or at 133.

Appellants do not dispute that the appointment of a
guardian for Cooper creates a rebuttable presumption of a
lack of testamentary capacity, and they concede that, at the
time Cooper was admitted to the care center, his mental
condition was bad. They contend, however, that he benefitted
from his treatment at the care center to the extent that, on
September 6, he had the testamentary capacity to revoke his
will. They contend that the *only* testimony supporting the
trial court's conclusion to the contrary was that of Dr. Berger,
the physician who treated patients at the care center.[2] They
argue that the overwhelming weight of credible evidence
supports their position.

■  Appellants point to testimony from family members
and employees of the care center to the effect that Cooper was

----

[2] Appellants contend that the trial court's determination was based solely on
Berger's testimony and that it is not substantial evidence of Cooper's mental state on
September 6, because Berger visited only monthly, for five to ten minutes, and had
no independent recollection of his August or September visits.

The trial court's written opinion states that it was "bound by what Dr. Berger
states." However, in the context of the entire opinion, it is clear the court arrived at
that conclusion by considering Berger's opinion in the context of Cooper's history of
dementia and his life-long outbursts of temper. The opinion also reflects that the
court considered the consistency of Berger's opinion with the testimony of Schwartz
and others.

mentally competent. However, the findings of the trial court, which had the advantage of seeing and hearing the witnesses, are strongly persuasive. *In re Provolt's Estate, supra,* 175 Or at 135. We conclude that the weight of the credible evidence shows that the trial court did not err. The evidence shows that Cooper had no clear idea of the extent of his personal property or that his real property might be part of a distribution, and he had no idea of how he wanted to devise his property or to whom he wanted it to go.

Schwartz testified that Cooper was aware that his only income was Social Security, but also that Cooper did not know the amount of cash he had or his monthly expenses at the care center. Wood's testimony was that, on August 31, Cooper was talking about his will and saying that he just had to get around to having a new will made. However, Schwartz' memorandum states that, when she told decedent that she had come to talk with him about his will, "He replied that he didn't have a will—he used to have one, but didn't any more."

Schwartz testified that when Cooper read his will, he understood it and said that the will was not "what I want." However, his conversation with her does not show that he knew the natural objects of his bounty. Schwartz explained to him that, without a will, his estate would be divided into three parts and that, under that distribution, Wood would inherit, as well as the children of Cooper's two deceased siblings. Cooper responded that he

> "definitely didn't want to leave anything to Charles' [deceased sibling] family because Fred was a 'thief' and had been in and out of jail. Alberta didn't need any because she couldn't take care of her own place in Salem[.]"[3]

When Schwartz suggested that Cooper might want to leave something to charity, he stated that "he used to go to the Elks club and had friends there."

Schwartz' testimony effectively summarized Cooper's understanding of the testamentary business that was before him:

---

[3] Cooper also said that he did not want anything to go to Jon, the son of a deceased sister, or Brinda or Sheri. Cooper had lived for many years with Brinda, who had been married to Cooper's nephew. Sheri is Brinda's daughter.

"Basically he didn't reach a decision. He couldn't decide who should have his property. He was talking about his home as though he would always have it and it would always be there when he died. And he said [Wood] didn't need that because she had enough to take care of with her own place."

The record does not demonstrate that, when Cooper tore up his will on September 6, he understood the value and extent of his property, the natural objects of his bounty or the nature of the business in which he was engaged. The evidence of Cooper's mental condition on September 6 is consistent with the assessments in the care center records. The July 12 report states that Cooper "can read very well [with] comprehension," but "long term memory is foggy. Short term is seconds long." The report for September 10, reports:

"Recent memory is still only minutes long not remembering 3 min. later. He is capable of a pleasant social conversation and smiles and laughs appropriately loves to joke around with the staff."

On that date, Cooper also "state[d] he feels well and has consistently maintained he will be 200 yrs. old the 1st of the year."

Appellants cite *In re Provolt's Estate, supra,* as demonstrating that, even if a testator suffers from dementia, there can be lucid moments during which testamentary capacity exists. Although appellants are correct that sometimes evidence supports that conclusion, that is not the case here. In *In re Provolt's Estate,* the evidence showed that the testator had discussed the disposition of his property and requested a friend to find an attorney; the friend made notes as to the beneficiaries and property distribution; a lawyer prepared a will and then discussed it with the testator; a treating physician testified that the testator had mental capacity. On that evidence, the Supreme Court held that the presumption of mental incompetence had been rebutted, despite testimony from a long-time treating physician that the testator lacked mental capacity.

The evidence in *In re Provolt's Estate, supra,* showed directed activity on the part of the testator to accomplish a testamentary disposition. That purpose is not evident here. Our *de novo* review does not persuade us that, despite his mental deterioration, Cooper had the requisite testamentary

capacity required to revoke his will when he tore it up. The trial court did not err in dismissing the petition to revoke probate.

Affirmed.