Argued September 9; affirmed November 16, 1943

IN RE BOND'S ESTATE
WILLIAMS ET AL. *v.* PRESBYTERY OF PORT-
LAND ET AL.

(143 P. (2d) 244)

510

Before BAILEY, Chief Justice, and ROSSMAN, KELLY, LUSK, BRAND and HAY, Associate Justices.

*Thaddeus W. Veness* and *Nicholas Jaureguy,* both of Portland (Thaddeus W. Veness, Cake, Jaureguy & Tooze, Hart, Spencer, McCulloch & Rockwood, David L. Davies, Veazie & Veazie, Simon, Gearin, Humphreys & Freed, and Edwin D. Hicks, all of Portland, on the brief) for appellants.

*George Black, Jr.,* of Portland (Black, Johnson & Kendall, of Portland, on the brief) for respondents.

BAILEY, C. J.

Two questions are here presented: (1) Did Miss Ellen Elizabeth Bond, who died April 26, 1940, possess sufficient testamentary capacity on or about April 1, 1936, to revoke the will which she had executed on January 21, 1913? And (2) if she had such capacity, did she intend, by her course of action later to be described, to revoke that will?

The contestants include seven first cousins of the decedent, four related to her through her mother, and three through her father. Another contestant is the administrator with the will annexed of the estate of Frank Bond, deceased, a first cousin of Miss Bond.

The remaining contestant is the widow and sole legatee of Frank Bond, deceased. The seven cousins who are contestants and Frank Bond, who died July 22, 1940, were the only heirs of Ellen Elizabeth Bond.

The proponents of the will are the following corporations: Presbytery of Portland, The Portland Art Association, Board of Foreign Missions of the Presbyterian Church in the United States of America, Board of Home Missions of the Presbyterian Church in the United States of America, The Directors of the Library Association of Portland, The Young Men's Christian Association of Portland, Oregon, and The Portland Women's Union; an individual, Bertha Griffith; and Earl C. Bronaugh (also known as Earl C. Bronaugh, Sr.), "in his representative capacity as administrator of the estate, and as executor of the purported will, and as testamentary trustee in and under said purported will of Ellen Elizabeth Bond, deceased." The above-mentioned corporations and Bertha Griffith were named as beneficiaries in Miss Bond's will as originally executed. Anna C. McDonald, who was also a beneficiary under that will, was named as a defendant in the contest but made no appearance.

On April 27, 1940, a petition was filed by Earl C. Bronaugh in the probate court for Multnomah county, setting forth that the petitioner believed that it was the intention of the testatrix to revoke her will executed in 1913, and requesting that the petitioner be appointed administrator of Miss Bond's estate. On the same date that the petition was filed, an order was entered appointing Judge Bronaugh as such administrator. Two of the proponents herein, Presbytery of Portland, a corporation, and The Portland Art Association, a cor-

poration, on February 8, 1941, filed a petition alleging that the decedent at the time of mutilating the will theretofore executed by her was incompetent and did not intend "to absolutely revoke her said will". On the date last mentioned, the will of January 21, 1913, as reconstructed by the proponents, was admitted to probate in common form. This contest was shortly thereafter initiated. From a decree of the circuit court holding that the will of Ellen Elizabeth Bond had been revoked, the proponents prosecute this appeal.

The will in question was prepared by Earl C. Bronaugh, attorney for Miss Bond. It apparently consisted of five pages enclosed in a cover bearing Judge Bronaugh's name and office address. Endorsed on the back of the cover by Judge Bronaugh was the title, "Last Will and Testament of Ellen Elizabeth Bond". Also on the cover, below the writing of Judge Bronaugh, there appears in lead pencil, written by Miss Bond, with her underscoring here represented by italics, this notation:

"This Will is *Nul*
I have kept it for a *few*
things that I like & will
transfer to my *new will.*"

On or about April 1, 1936, Miss Bond cut from the will one-half of the first page, except a marginal strip bearing her signature, all of page 2, part of page 3 and all of page 4. She also crossed out with lead pencil a part of the first numbered paragraph of the will, and elsewhere in the will made notations in pencil. The words "ratably" and "proportionally abated", in the last paragraph of the will, were underscored with lead pencil. A copy of the will as so mutilated, and with

the pencil writing here appearing in italics, is as follows:

*"This part of will is just kept for the wording of my new will which is not written yet.*

"KNOW ALL MEN BY THESE PRESENTS, That I, Ellen Elizabeth Bond of the City of Portland, in the State of Oregon, do make, publish and declare this to be my Last Will and Testament, hereby expressly revoking all wills and parts of wills by me at any time heretofore made.

*"I have no just debts*

"FIRST. I direct that all my just debts and liabilities be first paid by my executor, hereinafter named, as soon after my decease as may be convenient, and particularly I direct my said executor to pay to my cousin, Martha Tenny Williams, at No. 1226 Main Street in the City of Buffalo, New York, the amount that may be justly due her with interest on a loan of approximately the sum of Eight Hundred ($800.00) Dollars made by her to me several years ago, and no lapse of time shall ever operate as a bar to the payment of the amount justly due thereon.

manner as the trustee thereof shall deem advisable, the principal of said fund to be maintained intact for endowment purposes.

"ELEVENTH. I give and bequeath unto the Board of Foreign Missions of the Presbyterian Church in the United States of America the sum of Twenty Five

ELLEN ELIZABETH BOND

*April 1st 1936*

Thousand ($25,000.00) Dollars in money, the same to become a part of the permanent endowment fund of said Board, the income therefrom to be used for the benefit of foreign missions under the auspices of said Board, and it is my desire especially that said income be first applied perpetually to the education of a native missionary in China.

"TWELFTH. I give and bequeath unto the Board of Home Missions of the Presbyterian Church in the United States of America, the sum of Twenty Thousand ($20,000.00) Dollars in money, the same to become a part of the permanent endowment fund of said Board, and the income therefrom to be used by said Board in the maintenance and extension of its home mission work.

"THIRTEENTH. I give and bequeath unto the Presbytery of Portland, a corporation organized and existing under the laws of the State of Oregon, the sum of Five Thousand ($5,000.00) Dollars in money, to become a part of a permanent endowment fund, and the income therefrom devoted to the work of said Presbytery conducted under the auspices of its Home Missions Committee, it being my hope and desire that this bequest may be a nucleus of an endowment fund for the maintenance of home mission work within said Presbytery of Portland.

"FOURTEENTH. I give and bequeath unto the Portland Art Association, as a part of its permanent endowment fund, the sum of Ten Thousand ($10,000.00) Dollars in money.

distributed between the legatees in this my will named in the same proportion and ratio as their specific legacies hereinabove mentioned bear to each other. If, from any cause unforeseen there should be a shrinkage in the value of my estate so that there shall not be sufficient to pay said specific legacies in full, then said specific legacies shall be ratably and proportionally abated.

"IN WITNESS WHEREOF, I have hereunto set my hand and seal this 21st day of January, in the Year of our Lord One Thousand Nine Hundred and Thirteen.

"ELLEN ELIZABETH BOND    SEAL

Executed in presence of:

MABEL BABCOCK
FRANKLIN F. KORELL

"THE FOREGOING INSTRUMENT, written on this and four preceding sheets, was signed and sealed by Ellen Elizabeth Bond, the Testatrix therein named, on the 21st day of January, A. D. 1913, in the presence of each of us, the undersigned, and was by her then and there published and declared to be her Last Will and Testament, and at her request and in her presence, and in presence of each other, we thereupon, at the same time and place, have affixed our names thereto as attesting witnesses.

"MABEL BABCOCK
"FRANKLIN F. KORELL

Upon the execution of the will Judge Bronaugh placed the document in one of his office envelopes, wrote on the face thereof, "Will of E. Bessie Bond", and turned over to the testatrix the will so enclosed. Miss Bond made notes on the envelope, introduced as an exhibit in the case. In the upper right-hand corner she wrote:

"Ellen Elizabeth Bond
This is my signature".

And below that she added:

"This will is *null* and only kept for a few things I like for my new will
"Ellen Elizabeth Bond".

The word "null" was underlined as indicated. Across the end of the envelope Miss Bond wrote:

"Ellen Elizabeth Bond
Look over *soon*".

Enclosed in the envelope containing the will were two slips of paper, which had been cut out of the will. One of them contained a paragraph numbered "Eighteenth", in which Miss Bond bequeathed to Anna C. McDonald the sum of $1,000. The other slip contained most of a paragraph numbered "Twentieth", in which Miss Bond devised her real property to some one whose name or other designation was removed, to be sold and the proceeds distributed; and part of three lines of a paragraph numbered "Twenty-first", in which Miss Bond directed that the rest, residue and remainder of her estate "be sold" "and converted into money". Between the two phrases last quoted part of the page was missing. In the reconstructed will the words "by my said executor" were inserted in that space. Along

the margins of the slip of paper last described were five interrogation marks, made in pencil.

The other parts cut from the will were not found, so far as the record discloses. No carbon copy of the original will was retained by Judge Bronaugh. The material used to reconstruct the document was assembled largely from notes made by Miss Bond. The seventh paragraph of the will was never found, and no attempt was made to reconstruct it.

The mutilated will contains bequests totaling $60,000 to four charities. There appear in the reconstructed will, although not in the mutilated document, the following bequests to charities: Portland Women's Union, $2,000; Library Association of Portland, $10,000; Young Men's Christian Association of Portland, $10,000; and Anti-Saloon League of Portland, $2,000. Also contained in the reconstructed will are bequests totaling $8,600 to eight individuals, seven of whom were Miss Bond's cousins and second cousins, and the eighth a Portland friend. All those individuals except Anna C. McDonald and Bertha Griffith, both second cousins of Miss Bond, had died prior to April 1, 1936. The Anti-Saloon League of Portland, a voluntary association of individuals, had disbanded prior to that date.

No question is raised as to the mental competence of Miss Bond to execute her will of January 21, 1913. The contention of the proponents is that the will was never revoked. They assert that on April 1, 1936, the date on which it is assumed that she mutilated the will, Miss Bond was not mentally competent to revoke it. They further contend that, if then competent to revoke the will, she did not intend such revocation to become effective until she would have executed a new will. This

latter contention we shall leave for later consideration. In discussing Miss Bond's mental status as of April 1, 1936, the proponents assume that, if competent on that date, what she then did constituted a valid and unconditional revocation of her will.

■■ The same degree of mental capacity is necessary to revoke a will as to execute one: *In re Dougan's Estate*, 152 Or. 235, 253, 53 P. (2d) 511; *Tonnelier v. Tonnelier*, 132 Fla. 194, 181 So. 150. In order to execute a will the testator must have sufficient mental capacity to understand the nature of the business in which he is engaged, know the kind and extent of his property and be able to bring before his mind the persons properly the objects of his bounty: *In re Dougan's Estate,* supra.

The foregoing rule for determining testamentary capacity has been announced many times by this and other courts. In *Chrisman v. Chrisman,* 16 Or. 127, 18 P. 6, after a statement of the rule the following explanation of it is quoted with approval from the opinion of Mr. Justice Washington in *Harrison v. Rowan,* 3 Wash. C. C. 580:

> "He (the testator) must, in the language of the law, be possessed of a sound and disposing mind and memory. He must have memory. A man in whom this faculty is totally extinguished can not be said to possess understanding in any degree whatever, or for any purpose. But his memory may be very imperfect; it may be greatly impaired by age or disease; he may not be able at all times to recollect the names, the persons, or the families of those with whom he has been intimately acquainted; may at times ask idle questions, and repeat those which had before been asked and answered; and yet his understanding may be sufficiently sound for many of the ordinary transactions of life. He may not

have sufficient strength of memory and vigor of intellect to make and digest all parts of a contract, and yet be competent to direct the distribution of his property by will. This is a subject which he may possibly have often thought of, and there is probably no person who has not arranged such a disposition in his mind before he committed it to writing. The question is not so much what was the degree of memory possessed by the testator as this, had he a disposing memory? Was he capable of recollecting the property he was about to bequeath, the manner of distributing it, and the objects of his bounty? To sum up the whole in the most simple and intelligible form, was his mind and memory sufficiently sound to enable him to know and understand the business in which he was engaged at the time he executed the will?''

■ If the testator has possession of his mental faculties and understands the business in which he is engaged, he is not incapacitated to execute or revoke a will because of old age, sickness, extreme distress or debility of body: *Chrisman v. Chrisman,* supra; *In re Sturtevant's Estate,* 92 Or. 269, 178 P. 192; *Clark v. Clark,* 125 Or. 333, 267 P. 534; *Pickett's Will,* 49 Or. 127, 89 P. 377; *In re Estate of Bose,* 136 Neb. 156, 285 N. W. 319.

■ The important issue is the condition of Miss Bond's mind on April 1, 1936. Evidence of her mental status, together with her appearance, conduct, acts, habits and conversation, both before and after that date, is relevant so long as it has a reasonable tendency to indicate her mental condition at the time of revoking her will: *In re Morley's Estate,* 138 Or. 75, 5 P. (2d) 92; *Mason v. Bowen,* 122 Ark. 407, 183 S. W. 973, Ann. Cas. 1917D, 713; *In re Miller's Estate,* 16 Cal. App. (2d) 154, 60 P. (2d) 498. The probative force of such evidence

depends upon the relation in time between the statements or conduct of the testatrix and the act of revoking her will: *Mason v. Bowen,* supra.

■■ Before the altered and mutilated will could be introduced in evidence, or secondary evidence be given as to its contents, it was incumbent upon the proponents to account for its condition: §§ 2-302 and 2-903, O. C. L. A. See also *Carrithers v. Jean's Executor,* 249 Ky. 695, 61 S. W. (2d) 323. When the mental capacity of the testator is in issue, the proponents of the will have the burden of proving that the testator lacked testamentary capacity at the time he altered or mutilated the will: *In re Thompson's Estate,* 48 S. D. 474, 205 N. W. 47; *Watkins v. Watkins,* 142 Miss. 210, 106 So. 753.

The proponents herein assert that Miss Bond on April 1, 1936, lacked testamentary capacity either to make a new will or to revoke the will that she had theretofore executed; that such incapacity was due to senile dementia; and that she had been so afflicted for some years prior to 1936. They contend that as early as 1930 Miss Bond's mind began to be unsound and that such condition became progressively worse, to such a degree that from 1935 until her death the testatrix was wholly incompetent to revoke her will.

At the time of her death Miss Bond was eighty-four or eighty-five years old. She was born in Pennsylvania about 1855, and came to Portland with her parents and elder sister in 1870. Prior to 1897 her mother and sister died, and in that year her father died. His entire estate was left to her on condition that she care for her aged aunt, his sister, who was deaf and dumb.

The estate Miss Bond received from her father was appraised at a little over $20,000 and consisted almost entirely of real property subject to mortgages totaling

more than $4,500. The estate of Miss Bond at the time of her death was appraised at slightly in excess of $102,000, of which amount $70,000 represented real property. Due to the effect of the financial depression of 1929 and subsequent years, the appraised value of her estate was much less than it otherwise would have been. Three separate parcels of land on which she had held mortgages and to which she had later taken title either by foreclosure or conveyance were appraised in her estate at a sum more than $28,000 below the total of her liens and delinquent taxes against the properties at the time she acquired title to them.

From the time of her father's death until her last illness Miss Bond managed her own business affairs. She employed real estate agents to find tenants for her properties, but before any lease was made the matter was submitted to her for approval. Whenever a written lease was entered into by Miss Bond it was either drawn up by her attorney or examined by him before she signed it. The record shows at least three written leases signed by Miss Bond in 1936, dated from February 3 to September 22 of that year. In the following year she executed six leases, dated from January 2 to July 15, 1937.

Preceding the year 1938 Miss Bond personally attended to the payment of both her *ad valorem* and income taxes. She obtained statements of her real property taxes and paid them before March 15, in order to take advantage of the statutory discount. In 1935, for example, she paid on March 14 the taxes for that year on three tracts of land owned by her. Later in 1935 she acquired title to a tract of land on which she held a mortgage. On May 21, 1935, she was notified that the deed to the property was made to her, and on June 4

she paid $2,074.53 in delinquent taxes and $260.10 in current taxes against the property. During the same year, what was known as the Richtmyer property was purchased in her name at sale on mortgage foreclosure, and on September 5 of that year she paid delinquent taxes thereon amounting to $737.60 and current taxes of $185.36. Also during 1935 she paid on what was known as the Cheney property delinquent taxes totaling $349.33 and current taxes of $154.99. The last-mentioned property was purchased at foreclosure sale by Title & Trust Company, a corporation, certificate of purchase was assigned to her by that company, and a deed was issued to her by the sheriff. On April 12, 1935, Miss Bond paid the balance of 1931 and 1932 delinquent taxes, amounting to $4,253.49, on real property of the Gillette estate on which she held a mortgage. She then requested of the administrator of that estate that the amount of taxes so paid by her be added to the mortgage indebtedness.

In the year 1936 Miss Bond paid on March 13 current taxes in excess of $2,076 on six tracts of land, comprising all her real property holdings. To make up that sum she withdrew $700 from her savings account in the United States National Bank and the balance from her savings account in the Canadian Bank of Commerce.

For some time in 1937 Miss Bond was confined to her home because of acute sciatic rheumatism and was unable to go to the court house to pay her real property taxes. She nevertheless procured tax statements, withdrew the necessary money, $1,959.80, from her savings and sent it by a friend, so that her taxes were paid before March 15.

Prior to 1938 Miss Bond attended to the filing of her federal and state income tax returns and the payment

of those taxes, and in doing so did not require the aid of her attorney or an accountant. She did, however, in some instances, after assembling the necessary data, obtain assistance from employees in the income tax offices to complete her returns. Her state income tax return in 1937 was made out by a friend, Mrs. Davis, before an auditor of the state tax commission on February 16, while Miss Bond was confined to her home. The information required for making the return, however, was furnished by Miss Bond. Her federal income tax return in the same year was signed and sworn to by Miss Bond on March 5, 1937, although the record does not show by whom it was prepared.

In making her state income tax returns for 1934 and 1935 Miss Bond entered as deductions the amounts she had paid during those years in delinquent taxes on the Gillette property. Those deductions were disallowed by the state tax commission on August 15, 1936. The proponents of the will argue that Miss Bond's claim of deduction is some evidence that she was incompetent to look after her own affairs. It is further asserted by the proponents that in entering those deductions Miss Bond acted counter to the advice given her by her attorney, Judge Bronaugh. Concerning that matter Judge Bronaugh testified that he did not advise her that she was not entitled to the deductions, before she filed her returns.

It may be noted in this connection that the question of whether a deduction could be claimed for taxes paid by one not the legal owner of the property when the taxes accrued was considered so controversial as to be the subject of litigation which culminated in an appeal to this court: *Broadway-Madison Corporation v. Fisher*, 164 Or. 401, 102 P. (2d) 194. The reason given

by the state tax commission for disallowing Miss Bond's deductions was that: "Delinquent taxes paid by a mortgagee prior to foreclosure of the mortgage represent an additional loan on the property and, if paid after foreclosure, represent additional cost of the property." That explanation is in harmony with the reasoning of this court in the decision later rendered in *Broadway-Madison Corporation v. Fisher,* supra.

On August 14, 1934, Miss Bond paid the taxes on the Gillette property assessed in 1932 and 1933. The proponents point to the fact that Judge Bronaugh had advised her not to pay those taxes for the reason that he felt sure that the legislature in its 1935 session would enact legislation to waive the payment of interest and penalties on delinquent taxes, and she might save money by waiting; and that regardless of the expected legislation Miss Bond paid the taxes and thereby suffered a loss. It is apparent from his testimony that Judge Bronaugh had in mind the regular biennial session of the legislature in 1935, which convened in January and adjourned March 13.

Charles T. Haas, attorney for the Gillette estate, was called by the proponents as a witness. He testified that during the early part of 1935 Miss Bond made a check in the Multnomah county tax collector's office, ascertained the amount of delinquent taxes against the Gillette property and discussed with him the payment thereof; that he advised her, he believed, not to pay the taxes at that time for the reason that the mortgagor was "not paying interest on it, under some statutory provision which waived the interest on delinquent taxes"; but that she nevertheless paid the taxes.

It seems to be assumed by the proponents that the legislature in its regular session in 1935 enacted legis-

lation which would have enabled Miss Bond to discharge the Gillette property from the lien of delinquent taxes without paying interest or penalties. They do not cite any such law enacted during that session, and we have not been able to discover any.

The legislature did, however, at its special session in 1935, waive and cancel all penalties and interest on delinquent taxes for 1934 and prior years upon payment of such taxes in the manner provided by the act: chapter 5, Oregon Laws Special Session 1935. The special session was called primarily because of the emergency created by the burning of the capitol on April 25, 1935. It convened October 21 and adjourned November 9. Chapter 5, Oregon Laws Special Session 1935, did not become effective until February 8, 1936.

There was no statute in existence on April 12, 1935, so far as we have been able to ascertain, which would have justified Mr. Haas's statement that interest on delinquent taxes was then waived, if applied to such taxes for years subsequent to 1930; and not any of the delinquent taxes paid by Miss Bond on the Gillette property were for 1930 or prior years. Likewise, Judge Bronaugh's expectation in regard to legislative waiver of interest and penalties was not fulfilled.

Judge Bronaugh was Miss Bond's attorney from 1905 until her death, with the exception of a period from 1907 to 1910, when he was on the circuit bench, and possibly an interval prior to 1937, of which more will later be said. Up to February 15, 1935, he kept in his office most of Miss Bond's notes and mortgages and some of her other valuable papers. He attended to the collection of interest due on some of, if not all, the mortgages she held. On the date last mentioned, the interest on numerous mortgages was in arrears. None

had been paid on the Clark mortgage since August 8, 1932. On the Gillette mortgages, three in number, no interest had been paid after August 15, 1934. And foreclosure proceedings had been or were about to be instituted on the Richtmyer mortgage. The decree of foreclosure therein was entered June 12, 1935.

On February 15, 1935, at her request, Judge Bronaugh delivered to Miss Bond the Clark and Gillette mortgages and the notes for which the mortgages had been given as security. Miss Bond went to the office of Mr. Haas, late in March or early in April, according to his testimony, and requested that the administrator of the Gillette estate pay the interest on the mortgages direct to her. Mr. Haas at that time was attorney for the administrator of the Gillette estate, owner of the mortgaged property. Miss Bond disclosed to him, or he then knew, that Judge Bronaugh had been acting as her attorney. When he asked why she did not have Judge Bronaugh handle the matter, he testified, she answered that he was too dilatory, and also stated that she was distrustful of him. On April 12, 1935, Mr. Haas wrote to the administrator and asked him to make payment of interest direct to Miss Bond, and the administrator thereafter complied with that request.

Early in 1935, in checking tax records, Miss Bond discovered with surprise, according to a witness who was with her at that time, that Judge Bronaugh had taken title to the Clark property. Judge Bronaugh, however, testified that at the time he took title to that property he informed Miss Bond that he was so doing.

On March 12, 1935, Judge Bronaugh wrote to Miss Bond a letter in which he said that she had asked him for a statement of his dealings with the property formerly belonging to the Clark estate. He thus continued:

"I took over this property in November, 1929, purchasing same at sale made under order of the probate court by the administrator of the Clark estate for the purpose of paying indebtedness owing by the estate. Instead of paying the money directly to the administrator when I purchased the property, I paid the claim directly to the creditors of the estate to the amount of $2,080.63. This amount included a bill of $251 for repairs to the old furnace and $700.49 for the new furnace in the property, which all went for the betterment of the property."

The letter then set forth the amount expended by Judge Bronaugh in the purchase of the property, the interest paid to Miss Bond, the cost of repairs and the rentals received from the property. According to the statement, Judge Bronaugh had paid Miss Bond the interest from February 8, 1930, to August 8, 1932. He had also paid all the 1927 taxes and the first half of the 1928 taxes. The total shown to have been paid out by Judge Bronaugh in the purchase of the property and for upkeep, taxes and interest was $1,535.99 more than he had received as income from the property.

Judge Bronaugh testified that the property in question had been appraised in the Clark estate at $15,000, and that he purchased it in order to assist a client to recoup an expected loss on a mortgage held by the client on land in Washington county.

Some time after writing the letter above described, Judge Bronaugh notified Miss Bond that he was willing to transfer to her the title to the Clark property "in payment of the indebtedness due" her on her mortgage. Before accepting that offer, however, Miss Bond had the property appraised by real estate agents who were representing her in other matters. They re-

ported to her on May 2, 1935, that in their opinion the property was worth between $6,000 and $6,500 at that time. On May 16 of that year Miss Bond notified Judge Bronaugh that she would accept a deed to the property, and thereafter conveyance was effected. The total of encumbrances against the property at that time, including Miss Bond's mortgage of $4,500 and the delinquent taxes, was in excess of $7,500.

During negotiations concerning the Clark property, Judge Bronaugh on May 3, 1935, prepared a claim for Miss Bond against the Gillette estate for the amount due her on notes secured by the mortgages above mentioned and for delinquent taxes which she had paid. He also continued to act as her attorney in numerous matters until he was appointed her guardian in the fall of 1938. We find no substantial support for the proponents' assertion that for two or three years prior to 1937 he did not act as her attorney. During that period he apparently performed all the legal services that were rendered to or on account of Miss Bond.

Introduced in evidence were Miss Bond's savings account books covering her banking transactions from May 21, 1909, until the date of her death. At no time did she maintain a checking account in any bank. The Canadian Bank of Commerce in Portland, Oregon, was the principal repository of her funds.

On December 31, 1935, Miss Bond withdrew $1,400 from her savings account in that bank and deposited it in her savings account in the United States National Bank. In the following year, on September 4, she transferred $4,300 to the latter bank. And on September 2, 1936, she withdrew $5,000 from her account in the Canadian Bank of Commerce with the intention of depositing it in her savings account in the Bank of California,

but placed only $2,500 of that amount in the latter bank. In her bank book is a slip of paper on which she wrote: "The Bank of California could not take the $5,000 & only took $2,500.00. So $2,500.00 was returned to Canadian. Sept. 2d 1936." Her reason for making the transfers of funds was to obtain the best interest returns possible on her savings.

Beginning in 1920 Miss Bond conducted a system of bookkeeping by means of entries in her savings bank books. Therein she recorded the sources of funds deposited and the reasons for withdrawal. From early in 1923 until she entered the hospital in her last illness, she made written explanation in her savings account books of practically all deposits and all withdrawals. Although she sometimes made as many as four deposits in a day, and up to three or four withdrawals, her practice was to make each one a separate banking transaction, so entered in the bank's records and noted in her pass book. Between January, 1934, and April, 1938, she made 228 deposits in the Canadian Bank of Commerce and 109 withdrawals of savings from that bank.

It is apparent that Miss Bond kept all papers pertaining to her business transactions, and in addition such items as theater programs and newspaper clippings. The contestants introduced in evidence as one exhibit an envelope containing more than forty such receipted bills, programs and miscellaneous memoranda, dating from 1907 to 1920. All the receipted bills bear on the back thereof, or on the respective envelopes containing them, notations made by Miss Bond. Her comments likewise appear on the programs. Her practice of making notes on papers and documents evidently dated from 1907 at least, and was not a habit acquired in her late years.

Until she was removed to the hospital, about April 1, 1938, Miss Bond lived in the house that had been built by her father in 1877 at the location now numbered 233 Southwest Park avenue. From 1899 or 1900, after her aunt's death, she lived alone until early in 1937. The house had never been equipped with modern conveniences except a telephone. It had no provision for gas or electric service and no furnace.

From sometime in November, 1936, until late in March or early in April, 1937, Miss Bond was confined to her home with sciatic rheumatism. At first she employed no one to care for her home or prepare her meals. Miss Agler, Judge Bronaugh's secretary, called at her home, almost daily, brought provisions to her and looked after her general welfare. Early in January, 1937, Miss Bond's condition became so aggravated that Miss Agler called in an osteopath or chiropractor and a woman to act as practical nurse and housekeeper. The osteopath or chiropractor made eight calls to administer treatments, and Miss Bond's condition improved greatly.

When the practitioner first called, Miss Bond was so crippled that she could not move from her chair. She was dressed in clothing that was not clean and apparently had not been changed for some time, and she had not recently bathed. She had been occupying only one room of her home, the living room, which was heated by a stove with a pipe attached to a closed fireplace. Miss Bond apparently had been doing her cooking on the heating stove and had been sleeping on a couch in that room. Scattered on the floor around her chair were many newspaper clippings and many papers. Newspapers were also piled against the walls of that room and the kitchen, according to some of the witnesses.

The practical nurse remained about one week, and on January 21, 1937, was replaced by Mrs. Myrtle Morris, who stayed with Miss Bond for about seven months. Within three months after Mrs. Morris began to take care of her Miss Bond became able to walk around, assisted by a cane. During the summer of 1937 she went, accompanied by Mrs. Morris, to the office of a chiropractor for treatment, about twenty times in all, and went downtown to shop.

Mrs. Margaret Morris, a daughter-in-law of Mrs. Myrtle Morris, when the latter became ill, took her place and was employed in Miss Bond's home from sometime in January, 1938, until Miss Bond fell and broke her hip on March 27, 1938. She generally did not stay at Miss Bond's home at night or on Sunday.

Miss Bond's fall occurred in the yard of her home. After the accident she insisted that her injury was not serious and at first did not call a doctor. A policeman who discovered that she had fallen summoned public first-aid facilities, and Miss Bond apparently considered the care so provided sufficient for her needs. On the last day of March or the first day of April, 1938, she was taken to Hahnemann hospital, where she remained until her death more than two years later.

From about the time of her arrival in Portland until her death, Miss Bond was a member of the First Presbyterian church in Portland. She attended church services regularly until November, 1936. She also attended the monthly meetings of the women's missionary society of the church until the summer of 1936, when the society was reorganized. Nine of the witnesses called by the proponents were members of the First Presbyterian church in Portland.

One of the church members, who had known Miss Bond since 1885, testified that she did not know of anything unnatural in Miss Bond's conduct or appearance, and that such changes as she observed in the decedent were those common to advancing age.

Another witness, who was a member of the church and an usher, stated that Miss Bond would usually come late to church and would insist upon going into the auditorium while the doors were closed during part of the service. On being told that she could not then go in, she was, according to the witness, "decidedly unpleasant and quite wild-eyed".

The wife of that member testified that Miss Bond's memory was not good, inasmuch as she asked the same question numerous times. She considered Miss Bond "not of sound mind" in 1936, but did not believe that she was insane.

Another church member, who had known the decedent since 1910, testified that Miss Bond had been, from her first acquaintance with her, very "suspicious of other people". In later years the witness had noticed a gradual decline in Miss Bond's health.

Still another member of the church, who was also an officer of the missionary society, testified that she telephoned to Miss Bond in January, 1938, about the decedent's contribution for the support of Mrs. Milliken, a missionary in China, and that Miss Bond responded that she did not have to pay the amount of her pledge, because Mrs. Milliken was no longer in China, but in Portland at that time. The witness went on to say that Mrs. Milliken was in China, contrary to

Miss Bond's statement. The proponents point to that testimony as showing confusion in Miss Bond's mind.

In regard to that same incident, however, another witness called by the proponents, Mrs. Myrtle Morris, stated that she was with Miss Bond at the time Mrs. Geary, a member of the church, told Miss Bond that Mrs. Milliken was no longer in China, but in Portland. That information was given Miss Bond prior to the telephone conversation described. Mrs. Morris was also present, she testified, when Miss Bond was called on the telephone concerning her pledge for the support of the missionary, and the decedent immediately thereafter discussed with her the information recently given Miss Bond in regard to the missionary's presence in Portland.

The last of this group of witnesses, church members whom we are not designating by name, had known Miss Bond as early as 1898. From 1902 or 1903 until 1912 or 1913 the witness was not in Portland. After an absence of ten years she returned to Portland and resumed her acquaintance with Miss Bond. She testified concerning an incident that occurred in 1916, referred to by proponents' counsel as "the 'disremember' episode". On that occasion, she stated, her husband, who had grown up with Miss Bond, said to the decedent: "Well, well, Elizabeth, we have had many happy times". And the decedent answered: "I disremember." The witness also narrated an incident that occurred in 1936, she thought. She and her husband, she stated, had purchased a new car and telephoned to Miss Bond, inviting her to come to dinner and take a drive in the car. And Miss Bond's response to that invitation, according to the witness, was: "You can't catch me."

The same witness, in contrasting Miss Bond's behavior in 1936 and 1937 with that of the period from 1913 to 1920, thus testified:

"She had very little to say to people in later years. Before, she was a—quite a talker, but in later years Miss Bond would speak so abruptly if you asked her a question, she would answer it quickly, and have nothing more to say; that was one thing I noticed particularly."

None of the witnesses whom we have just mentioned had ever had any business dealings with Miss Bond. The only time that most of them saw her was at church or at missionary meeting. Some of them merely spoke to her when they met her. When they testified concerning incidents which they said had occurred, they were indefinite as to dates.

Mrs. Iva N. Allen was at the time of the trial, and for ten years prior thereto had been, the assistant to the minister of the First Presbyterian church. She became acquainted with Miss Bond in 1931 or 1932, at a meeting of the women's missionary society, and thereafter saw her at meetings and church services. She described Miss Bond as then of "medium size and height, very quiet in appearance and actions; she always wore the same clothes; I never saw her dressed any differently". Miss Bond came to meetings alone, left alone, never took an active part, the witness stated, and spoke to few people.

The witness had never had any extended conversation with Miss Bond until early in 1937. At the beginning of their acquaintance she merely spoke to Miss Bond, she said, and later the decedent told her that she was interested in a missionary, Mrs. Milliken, and desired to contribute toward her support. For two or

three years prior to Miss Bond's being confined at home with rheumatism Mrs. Allen inquired concerning her health. She suggested to Miss Bond, she testified, that it would be better for her not to be living alone. In the fall of 1935 Miss Bond invited her to dinner, but the witness declined because she had to attend to her family. She called at Miss Bond's home a number of times, beginning about 1933 or 1934, and rang the bell at the front door, but no one answered. In January, 1937, while Miss Bond was ill, she went to the back door, rapped and was admitted by Mrs. Morris. She remained and visited with Miss Bond from twenty to thirty minutes. Her testimony thus continued:

> "Q. Mrs. Allen, will you state to the court whether, in your opinion, in about 1936, from your opportunity of observation of Miss Bond, Miss Bond was, or was not, of sound mind?

* * *

> "A. Judging Miss Bond in comparison with other people with whom we came in contact, she was definitely not normal. Does that answer the question? Not normal mentally."

Mrs. Allen stated that she had seen Miss Bond not more than four times in the later half of 1935 and six times during the first half of 1936.

Dr. John Hudson Ballard testified by deposition, at great length. He had been pastor of the First Presbyterian church in Portland from December 25, 1934, to the first of June, 1941. He first met Miss Bond when she called at his study and requested that the church choir render an anthem which she had in the form of a "very amateurish" music manuscript. According to the deponent, "it was entirely out of the question for the choir to attempt to sing that composi-

tion''. The incident embarrassed him, ''because this was my first intimation that there was something peculiar about Miss Bond's personality''.

He stated that he had called on Miss Bond at her home not less than three nor more than six times. Each visit was of short duration. The first, he believed, was in the third quarter of 1935. At that time he went to the back door of Miss Bond's home because his assistant told him that it was necessary to do so to gain admittance. [His assistant, Mrs. Allen, testified, it will be remembered, that it was in 1937 that she learned that it was necessary to go to the back or side door of Miss Bond's home in order to be admitted.]

Dr. Ballard testified that in his opinion Miss Bond's mind in the spring of 1936 was not sufficiently sound to enable her to devise ''an adequate plan or scheme for the disposition of her property''.

The witness described his vocation as that generally ''of a teacher, but also a minister or preacher, because I have fluctuated between those two particular professions''. He had specialized, he stated, ''in the field of psychology, which is closely related to philosophy.''

In their brief the proponents thus summarize Dr. Ballard's testimony.

''. . . Dr. Ballard was cross-examined at length. A large portion of this cross-examination was devoted to a demonstration that Dr. Ballard was unable to recall the various details of his conversations with Miss Bond. However, while the details which produced them could not be recalled, the impressions made upon him by those visits were very positive, and a rigorous cross-examination failed to modify his opinions.''

We concur in the view that Dr. Ballard was unable to testify to much more than an impression. His

opinion in regard to Miss Bond's mental condition was offered as though that of an expert. Even if his qualifications in "the field of psychology" had been shown to be such as to constitute him an expert, nevertheless the basis for the opinion he expressed was not sufficiently shown to give weight to his testimony.

Judge Bronaugh, whose testimony is elsewhere discussed in some detail, was also a member of the First Presbyterian church in Portland.

The First Presbyterian church of Portland was not named as one of the beneficiaries in Miss Bond's will. Bequests totaling $50,000, however, were given by the will to Presbytery of Portland, a corporation, Board of Foreign Missions of the Presbyterian Church in the United States of America, a corporation, and Board of Home Missions of the Presbyterian Church in the United States of America, a corporation.

Mrs. Gertrude Cooper, a witness called by the proponents, was manager of the Martha Washington hotel, conducted by the Portland Women's Union, one of the beneficiaries under Miss Bond's 1913 will. She testified that she had known Miss Bond since 1918 and described her in the following language:

"Well, she impressed me as a gentle and rather frail little person, with a great deal of strength of character and self-reliance, and a good deal of being a Yankee—what I would call Yankee shrewdness. I always, even from the beginning of my acquaintance, thought of her as a little eccentric.

"Q. As a little eccentric?

"A. Very religious and —

"Q. [Interrupting:] Very religious.

"A. And very self-centered; interested, it always seemed to me, in her business affairs and her church affairs, her own personal things.

"Q. During the years under discussion [1918 to 1930] what have you to say about her in her person and in her dress, and the matter of her toilet?

"A. She wore, — she was always exceedingly neat appearing; she wore, — her dresses were very simple, inexpensive, and her hats, that she wore, as I remember, and I think she always had a very good looking coat."

Asked what changes came about in Miss Bond after 1930, Mrs. Cooper answered:

"Well, of course she was always terribly saving —I mean saving even in those earlier years, it would seem to me to an abnormal degree,—and very unwilling to spend money for herself, for ordinary comforts by way of living, and the care of her eyes and her teeth, and all that, simply increased.

*　*　*

"Q. Did you see many changes in the matter of the care of her household?

"A. Well, as she got more frail, she wasn't able to take care of her house.

*　*　*

"Q. Will you describe how she lived?

"A. Well, when she—I really did not, as I say, —I didn't see much of the way she lived in her home until she got so frail that she was really confined to her home."

She was also asked what, in 1936, in her opinion, "was the state of Miss Bond's business judgment", and her answer was: "Well, I should say that any woman with Miss Bond's income, who lived as she lived then, was not capable of doing anything in a sound and normal way."

Mrs. Cooper testified that "around nineteen thirty-five, or 'thirty-six, or 'seven," Miss Bond told her that she "did not care so much about" Mrs. Cooper's

mother-in-law, who was also Miss Bond's aunt. She stated that Miss Bond then told her that some forty years previously Mrs. Cooper's mother-in-law spent a few days with her and then offended her by saying that she did not like Miss Bond's coffee. Mrs. Cooper did not believe that her mother-in-law had so spoken to her hostess, "because she was a very polite lady". The proponents call attention to Miss Bond's account of that incident, as an instance of hallucination.

Judge Bronaugh did not see Miss Bond's 1913 will from the day of its execution until it was delivered to him by the decedent in its mutilated condition some-time late in 1936 or early in 1937, along with other papers for safe keeping. The will was returned to her a few months later. While it was in his possession Judge Bronaugh examined the document. He testified that it was then in the same condition, he believed, as at the time of Miss Bond's death. At no time subsequent to the execution of her will until January 6, 1938, did Miss Bond consult him about the matter of making a new will. On that date, Judge Bronaugh, with his secretary, Miss Agler, went to Miss Bond's home at her request to discuss the provisions to be included in a new will.

The transcript of Miss Agler's short-hand notes of that conference indicates that Judge Bronaugh, and his secretary were with Miss Bond slightly over an hour. It reads as follows:

"Miss Bond talked with Judge Bronaugh about leaving some of her property. She told what she wished done with her home place—that she wanted it deeded to her church and wants the church to fix up the background behind the choir so that it will harmonize with the rest of the church and the remainder of the money they can use as they choose.

"She said she wants her books in the case to go to Kenneth Williams, Chappaqua, Westchester [county], New York, as well as the pictures in the cases.

"She said she wished her dictionary stand to go to John Williams Mabbs, of Chicago. She said she would study some more and then see Judge again about her property being disposed of."

At the conference Miss Bond had with her the mutilated will of 1913. In regard to her mental condition, Judge Bronaugh stated that he "tried to get her down to the important things about her property; she couldn't keep her mind on it; and finally, after about an hour and a quarter to an hour and a half she just got so tired that her mind wouldn't work. Well, after she got to the hospital, where she was properly fed and cared for, I was in hopes that perhaps she would, with improved physical condition, her mind would improve, and she might be able to do something before long, and twice—on two different occasions—I'd bring it up, but she couldn't keep her mind on anything then."

From the time that Miss Bond entered the hospital until the fall of 1938, Judge Bronaugh at her request looked after her business affairs. In the autumn of 1938 Miss Bond suffered a paralytic stroke, and Judge Bronaugh thereupon was appointed guardian of her estate. On January 25, 1940, he wrote to Mr. Wallis B. Williams, one of the contestants herein, at Yakima, Washington, an explanation of his annual report as guardian. In that letter he stated, among other things:

"... Under the law of Oregon, in the event of her [Miss Bond's] death, her estate would descend to her next of kin in equal degree. * * *

"In order that I may have available correct information as to her next of kin, such as would be

necessary in petitioning for administration of her estate, I am trying to determine with the greatest certainty possible just who there is living now who stands in the relationship of first cousin to her.''

The fact has hereinabove been mentioned that on the day of Miss Bond's death Judge Bronaugh dictated a petition to have himself appointed administrator of her estate, actuated by his belief that Miss Bond had died intestate.

Judge Bronaugh was asked to express his opinion, on the basis of his long acquaintance with Miss Bond, as to "whether in 1936 she fully comprehended the nature and extent of her property". He responded that he was "not in a position to answer that question categorically, to say whether she was sane or not."

Without prolonging the discussion of Judge Bronaugh's testimony, it is sufficient to say that we are convinced, in view of his dealings with Miss Bond and the facts hereinbefore related regarding his acts in the apparent belief that her will had been revoked, that Judge Bronaugh did not, until this proceeding was instituted, have any doubt that Miss Bond was mentally competent in April, 1936, to revoke her will.

Miss Alice Agler became Judge Bronaugh's secretary in 1921 and was in his employ at the time of the trial. Her acquaintance with Miss Bond dated from 1924 or 1925. She testified that she had always considered Miss Bond "a little bit odd".

She stated that "in 1925 to 1928" Miss Bond "always talked" business matters "over with Judge Bronaugh and took his advice". Among the matters Miss Bond discussed with Judge Bronaugh and in regard to which she followed his advice, according to the witness, were the Gillette and Clark loans made by her,

hereinabove mentioned. Miss Agler was unable to give "any instances about any changes in the way" Miss Bond "conducted her affairs" before and after the year 1934.

Questioned as to Miss Bond's mental condition in 1935 and 1936, Miss Agler thus testified:

"If you would talk to her on one matter, I think she would be all right, but if you were talking and took everything together, why I don't believe she could; that's my opinion.

\* \* \*

"Q. In your opinion, at that same time, in the first six months of 1936, was she fully aware of the natural objects of her bounty, and of those persons and institutions to whom or to which she might have any moral obligation, speaking generally?

\* \* \*

"A. I don't think she knew them all, to take care of everything that way. In my opinion she didn't."

The witness was interrogated as to whether Judge Bronaugh at any time before Miss Bond's death discussed with her, Miss Agler, or in her presence, any question at all as to Miss Bond's "right and intention and capacity to revoke that 1913 document". She answered, "I don't remember." Her testimony thus continued:

"Q. During all that period of time, up at least until the time of Miss Bond's death, you never made any statement to Judge Bronaugh, did you, questioning her complete capacity and her right and intention to revoke that 1913 will?

"A. No.

"Q. You just had no discussion with him about it at all?

"A. I don't believe so; I can't remember."

Charles T. Haas, whose testimony in regard to the Gillette loan has hereinabove been discussed, was one of the witnesses called by the proponents. He stated that on Miss Bond's third visit to his office, which occurred sometime between April 12, 1935, and May 4 of that year, the decedent, after making inquiries concerning the Gillette matter, asked him if he prepared wills, and how much he charged for such services. He informed her, he said, that his practice included that kind of work, and mentioned minimum and maximum fees therefor that he had charged.

At first she did not want to tell him her age, he stated, but finally did tell him, he believed, that she was eighty-one years old. She could not or would not, according to Mr. Haas, give him a description of the property she owned. Moreover, she stated to him that she did not know who her heirs were except one who lived in eastern Washington, and that she had not heard from her relatives for years. All that she could say when he asked her to whom she wanted to give her property was that she wanted "to do good with it". The next time Miss Bond returned to Mr. Haas's office concerning the Gillette loan, he asked her if she had a list of her property, the names of her relatives and a statement concerning "what she wanted to do with her money"; and her answer was, "I am working on it."

Miss Bond's visits were all in connection with the Gillette matter, Mr. Haas stated. After the first time that she mentioned to him the drawing of a will, he wanted to get rid of her, he testified, because "she was just a nuisance around my office. I know she sat there sometimes for an hour, waiting for me, and the girls would tell her I was busy. She would come in without

an appointment, you know, so she would have to wait."
Her visits came to an abrupt end, according to his testimony, for "all of a sudden she didn't come in any more and I never heard from her any more." Later while testifying he also stated that he tried to get rid of Miss Bond because he thought that "she was incompetent to draw a will", and he told her that before he would go any further with the drafting of her will he "wanted a medical examination of her, and she threw up her hands in holy horror." That occurred the last time he saw her. She did not at any time, he stated, retain him to draw a will for her.

For some time before Miss Bond talked to Mr. Haas about her new will he knew that Judge Bronaugh was her attorney. He had discussed the Gillette matter with Judge Bronaugh, and on May 4, 1935, Judge Bronaugh filed with him on behalf of Miss Bond a claim against the Gillette estate, which estate Mr. Haas represented as attorney for the administrator. Mr. Haas, according to his testimony, had never, he believed, discussed with Judge Bronaugh Miss Bond's mental status.

One of the witnesses testified that during the winter of 1937 and 1938 she called on Miss Bond at her home and mentioned to her that she ought not to be living alone, and Miss Bond answered that she was not alone, that her mother was in one corner of the room and her father in another. The witness also stated that she thought Miss Bond "believed in a personal God, and as she got more and more frail, I think her Heavenly Father, as she said, also was a great comfort to her, and really seemed to be quite in the room with her at times." Miss Bond was taken to the hospital in April, 1938, and while she was there, according to the testi-

mony of other witnesses, she had delusions about people and occurrences, in a few instances.

Two psychiatrists were called by the proponents as expert witnesses. Neither of them had ever seen Miss Bond or talked with her. In answer to a hypothetical question that covered fifteen pages of the transcript of testimony, put to them by the proponents, each stated his opinion to be that Miss Bond as early as 1935 was suffering from senile dementia to such an extent that she was mentally incompetent to make a will. The contestants also propounded to them a hypothetical question setting forth the facts as understood by them, and in answer thereto each of the experts testified that Miss Bond had testamentary capacity in 1936 at the time she revoked her will. The conclusions of the experts in answer to the proponents' hypothetical question seem to have been based largely on what occurred after November, 1936, when Miss Bond was ill and crippled with rheumatism. It is our opinion that neither the proponents' hypothetical question nor that propounded by the contestants stated all the material evidence set forth in the record, and that in each such question many of the facts which the experts were asked to assume were not established by a preponderance of the evidence.

We have hereinbefore referred generally to Miss Bond's business transactions. Three of the contestants' witnesses were connected with real estate concerns in the city of Portland. One of them had looked after the renting and maintenance of some of Miss Bond's property from 1930 until her death. Another had known her from 1924 or 1925 and had looked after some of her property as late as 1935 or 1936. The third had known her since 1935 and had on six occasions in

1936 held extended conferences with her in regard to the renting and repair of one of her buildings. All three witnesses expressed the opinion that Miss Bond was sane, of sound mind and capable of handling her own business in 1935 and 1936.

The decedent's physician, who attended her three times in July, 1937, a chiropractor who treated her twenty times during 1937, and her dentist, who had done work for her as early as 1930 and upon whom the decedent had called six times between July and October, 1936, all expressed the same opinion, that during the periods of treatment Miss Bond was rational and normal.

Mrs. Huff, one of the contestants' witnesses, had worked in the Canadian Bank of Commerce and during part of her employment there was in charge of the savings department. She met Miss Bond in the bank on an average of at least once a week between March, 1930, and the spring of 1937, and handled her savings deposits and withdrawals. She also called on Miss Bond at her home during the months of January, February and March, 1937. She stated that Miss Bond's "bank dealings were entirely normal; there wasn't anything unusual about them", and in her opinion Miss Bond was sane during all the time she knew her.

Albert W. Mundt, who was an auditor of the state tax commission, assisted Miss Bond on March 27, 1936, in preparing her 1935 income tax return. He testified that she brought to him all the necessary data from which the return was to be compiled. He regarded her as not only sane but capable of transacting business.

Mrs. Myrtle Morris, whose testimony has heretofore been discussed, was one of the proponents' witnesses. She remained in Miss Bond's home constantly

from early in January, 1937, until August of that year, and thereafter was a frequent caller at Miss Bond's home. She testified that during the first two or three months of 1937 Miss Bond was gruff with her, somewhat cross, and "didn't tell anybody her business, or anything about her folks or anything, without she was well acquainted with them", although after she became well acquainted with the witness Miss Bond "confided in me and told me all about her people, and all about her property". Mrs. Morris also stated that Miss Bond knew the exact location of all her papers, clothing, household equipment, letters and addresses of relatives. "She knew right where everything was if you didn't touch it." Mrs. Morris further testified that after Miss Bond had practically recovered from rheumatism in the summer of 1937 she was perfectly sane and normal.

Mrs. Margaret Morris, who, as above stated, was in Miss Bond's home for some time early in 1938, testified that she considered Miss Bond sane and of "very sound mind" as of that time.

Mrs. Louise Davis, a witness for the contestants, was employed in the Multnomah county tax department from 1918 until about 1940. She first met Miss Bond in the early part of 1935. Their second meeting was shortly before March 15 of that year, when Miss Bond called at the court house and asked Mrs. Davis to make a check of some taxes for her, which Mrs. Davis did. Soon after that Miss Bond again called at the court house and requested Mrs. Davis's assistance in checking delinquent taxes on the Everett street property later deeded to her by Judge Bronaugh. In 1936 Mrs. Davis saw Miss Bond "a great deal". The decedent called frequently at the court house and visited

with her, and in addition took her out to dinner and to a show and after the show to Miss Bond's home. Mrs. Davis also called on Miss Bond at her home five or six times in 1936. During those visits Miss Bond would discuss her properties with the witness. Asked whether the decedent would speak of "more than one property", Mrs. Davis answered:

> "Oh, yes, she told me about her business property, on the east side, and also another piece down by the auditorium, and then she told me about these lots in Slaven's addition, that her father had left her; and then about this piece of property that she had taken over for the mortgage; she had gone up to the apartment house and looked the apartment over, to see how it was rented, and then she also told me about the repairs she would have to have done on different buildings."

Mrs. Davis also stated that Miss Bond "was a very smart, intelligent woman", and that in her opinion Miss Bond "was sane, absolutely", she was coherent in her speech, and she "had a splendid memory".

Until late in 1938 Miss Bond communicated regularly with at least three of her cousins: Kenneth Williams of Chappaqua, New York; Wallis B. Williams of Yakima, Washington; and John Williams Mabbs of Chicago, Illinois. She also regularly sent Christmas cards and an occasional letter to her cousin Frank Bond and his wife, formerly of Cheyenne, Wyoming, and later of Washington, D. C. There is no evidence as to whether the decedent corresponded with or sent holiday greetings to her cousin Hattie M. Bond, who was unable to give testimony by deposition or otherwise, or to another cousin, Reginald H. Williams, who was abroad in the diplomatic service. Her two remaining cousins testified that they had not heard from her

for many years. One of them, Charles Avery Bond, had not seen her since she visited his father's home in her childhood. The other, Harry Lincoln Bond, had not seen her since July 24, 1915, when he had gone to Portland to call on her on his way home from California.

According to the deposition of Wallis B. Williams and the exhibits attached to it, Miss Bond's correspondence with the deponent was quite extensive. Sometime after June, 1936, possibly in 1937 or 1938, the witness believed, Miss Bond wrote to him and his son the following letter, with words underscored as here indicated:

"My dear cousins Wallis and Clayton—

"How can I ever thank you for the *wonderful* box of apples you sent me for Christmas—wonderful—not only to look at, but to eat. They are *delicious*. If this is what Yakima can produce the name Yakima should be proclaimed to the whole earth. Thank you many times. *Thank* you. I shall never cease to wonder at the marvel of these apples. Please pardon pencil. I have not been well for some time, but I am better and think shall have a happy Christmas. Sorry you could not have seen Jack when he was here. He is worth seeing—he is a strong character and you would like him.

"Do trust you will have a very happy Christmas. I often think of you and my prayer goes up that you may have strength for the path. Let me hear from you often. With love and every best wish to you and Clayton, as always

"Cousin Bess".

The parties to this litigation assume that Miss Bond mutilated her will on or about April 1, 1936, although no one was present at the time of the mutilation who could testify as to when it was done. The notations made by Miss Bond on the will and elsewhere

concerning the will are dated April 1, 1936. And in addition we do know that the will was in a mutilated condition when it was delivered by Miss Bond to Judge Bronaugh late in 1936 or early in 1937.

Ordinarily, in a will contest the attorney who drew the will and the subscribing witnesses are available to give their testimony as to the mental condition of the testator at the time of executing the will. However, in the event that the testator destroys, alters or mutilates his will secretly or unobserved, at a time not definitely known, there can be no direct evidence as to his mental condition at the time of that act. In such instance it becomes necessary to take into account the testator's conduct, appearance, acts and speech both before and after the time when the destruction or mutilation of the will is supposed to have been done.

■■ We have thoroughly considered the entire record in this case and are of the opinion that Miss Bond was mentally competent to revoke her will on April 1, 1936, or at any time prior to the end of the year 1937. During the years 1935, 1936 and 1937 Miss Bond demonstrated that she knew the property which she owned and was capable of handling matters connected with it and managing her other business affairs. In 1935, when interest payments were not being properly made on her loans, she demanded and obtained from Judge Bronaugh her notes and mortgages and took upon herself the collection of interest and the payment of delinquent taxes on the mortgaged properties. She also demanded an accounting from Judge Bronaugh in regard to the Everett street property on which she held a mortgage and title to which she later acquired. It may fairly be inferred that she did become dissatisfied with the manner in which Judge Bronaugh was han-

dling her mortgage loans; but her dissatisfaction can not be charged to hallucination. Her ability to manage her property is an important factor to be considered in determining her mental capacity to execute a will: *In re Finkler's Estate,* 3 Cal. (2d) 584, 46 P. (2d) 149. See also *Pickett's Will,* 49 Or. 127, 89 P. 377, and *In re Sturtevant's Estate,* 92 Or. 269, 178 P. 192.

We shall now consider the second contention of the proponents, that even if Miss Bond were mentally competent on April 1, 1936, to revoke her will, she did not intend such revocation to become effective until after she would have executed a new will.

The proponents admit that the will was at all times in Miss Bond's possession until after the mutilation occurred, and that Miss Bond herself cut from the document the parts hereinabove mentioned and made the pencil notations on the will and on the envelope containing it. They argue, however, that Miss Bond never intended to die intestate; that she wanted the bulk of her property to go to religious and charitable organizations, not to relatives; and that therefore she did not intend the revocation of her 1913 will to become effective until after the execution of a new will by her.

Attention has heretofore been directed to the will as mutilated and to the notations on it. Introduced in evidence as an exhibit was a slip of paper, at the top of which Miss Bond had noted: "My will written Jan. 21st, 1913—Gifts to relatives". Underneath that heading were listed the bequests made by the 1913 will to Miss Bond's relatives and to religious and charitable organizations. After the names of five of the individual beneficiaries she had written "dead"; and after one, the word "null". She had made a pencil mark through the bequest to the Portland Women's Union

and after that had written "null". She had put question marks after the bequest to the Presbytery of Portland, and drawn lines through the bequests to the Young Men's Christian Association and the Anti-Saloon League, with the word "null" following the name of each of those beneficiaries. Across the right-hand side of the slip of paper is the following: "So many of my relatives & friends are dead—Since my will of Jan. 1913". On the reverse side of the paper Miss Bond had written this note, with words underscored as here indicated:

"My will of Jan. 21st, 1913, is *destroyed*. This will is the only one in existence. I *mean* the *new* will *which* I *shall* make—but *is not written yet*—April 1st, 1936."

There was evidence, supplied by testimony of witnesses and by memoranda written by Miss Bond, that the decedent was contemplating making bequests to Albany College, Oberlin College, the Boys and Girls' Aid Society, Doernbecher hospital, "Missionary Society of First Presbyterian Church of Portland, Oregon, of which I am a member", "Virginia—youngest daughter of Ken Williams of Chappaqua, $5,000.00 to help her educate her children", and to "Anna Carrie McDonald, only daughter of Caroline Bond McDonald, of East Springfield, Erie Co., Pennsylvania, $5,000.00".

Among the decedent's papers was found the following memorandum written by her and underscored as here italicized:

"*For my Will*

"I want *only those* of my kindred *mentioned in my will* to have *anything* that belongs to me in *real estate—money—mortgages* or any other possession of *any kind* that I may be possessed of at the time of my death."

At least three witnesses testified that Miss Bond had stated to them that she did not want her estate to go to her relatives, and that she wanted the bulk of her estate, at least, to go to religious and charitable organizations. Two or three witnesses, one of whom was Judge Bronaugh, stated that she had said that she did not want her father's family to receive any part of her property.

Miss Bond had discussed the mutilated document with three of the witnesses. In the summer of 1937 she told Mrs. Myrtle Morris that it was not her will; and when asked why she had not destroyed it, she answered, according to Mrs. Morris: "I'm just keeping it to get notes off of it; I'm afraid I might forget these people died I had willed those things to before, and I wanted to take notes from this will for my new will". Judge Bronaugh stated that on January 6, 1938, when he called on Miss Bond, "she had this old will there in which she had—and stated that she had kept it for the reason that she wanted some of those things carried forward into her new will." And Miss Agler, who was present at the conference to which Judge Bronaugh referred, gave this testimony:

"Q. Miss Agler, what, if anything, was done with reference to the old will at this meeting of January sixth? What was expressed about that, if anything?

"A. Well, she wanted to take some things out of that will, is the way I got it; that is, she wanted to use that for her new will."

■ "A written will can not be revoked or altered otherwise than by another written will, . . . or unless the will be burnt, torn, canceled, obliterated or destroyed, with the intent and for the purpose of revoking the same": § 2-904, O. C. L. A. The cutting of her

will by Miss Bond was equivalent to tearing it, within the meaning of the statute: *Boyd v. Gorrell,* 376 Ill. 132, 33 N. E. (2d) 190; *In re Parker's Will,* 100 Misc. 219, 165 N. Y. S. 702; *Clarke v. Scripps,* 2 Rob. Eccl. 563, 163 English Reprint 1414.

■ The finding of a mutilated will among the effects of a competent testator raises a strong factual inference, often referred to as a presumption, that the acts of mutilation were performed by the testator *animo revocandi*: 68 C. J., Wills, page 990, § 758; 1 Woerner, American Law of Administration, third edition, § 48, at page 128; 1 Underhill on the Law of Wills, page 317, § 232; notes, 62 A. L. R. 1372 and 1373; annotation, 115 A. L. R. 712. In the case of *In re Carlson's Estate,* 153 Or. 327, 56 P. (2d) 347, this court quoted with approval from earlier Oregon decisions to the effect that when a missing will, last seen in the custody of the testator, can not be found after his death, a legal presumption is raised that he destroyed the instrument with the intention of revoking it.

The mutilated will in the case before us was found among the personal effects of Miss Bond at the time Judge Bronaugh took charge of her affairs as her guardian, during her last illness. And it is not open to doubt that Miss Bond herself performed the acts of mutilation.

■ The decedent executed her will on January 21, 1913, two days before she left Portland for a stay in California. In the interval between that date and April 1, 1936, death removed many of the individual beneficiaries named in her will. The value of her estate increased. She was contemplating on April 1, 1936, or about that time, making many bequests that were not included in her original will. Her acts of mutilating the will and her written comments relating thereto made

on the will and elsewhere at, apparently, the time of such mutilation, as well as her explanation later made to three witnesses regarding her retention of parts of some pages, leave no doubt that in cutting the document and removing some of it she intended to revoke her will. The weight of authority is to the effect that declarations of a testator, although not made at the time of the act of revocation by mutilation or otherwise, are admissible to show the intent with which the testator performed such act: annotation, 79 A. L. R. 1503.

It is argued by the proponents that, had Miss Bond intended to revoke the entire will, she would have destroyed it completely. Her reason for retaining parts of the original instrument, however, was not at all inconsistent with an intention to nullify that document as a testamentary disposition of her property. Under like conditions, in the case of *In re Olmsted's Estate,* 122 Cal. 224, 54 P. 745, the retention of part of a revoked will was thus considered:

". . . Consequence is sometimes attached to the circumstance that the testator retains among his valued papers an instrument which is contested as a revoked will. Under the circumstances presented in this case it seems quite natural that he should have done so,—to use the old document as, indeed, he appears to have been using it, as the foundation and framework for another testament."

██ ██ The proponents invoke the doctrine of dependent relative revocation by asserting that Miss Bond never intended to die intestate and that the revocation of her will was related to and dependent upon her execution of a new will. There is no evidence in the record that Miss Bond did not intend the revocation of her 1913 will to become effective at once. She may have intended when mutilating the document to execute a

new will at some future time, but she did not intend the revocation of that instrument to wait upon the making of a new will. As stated in 1 Jarman on Wills, seventh edition, page 136, "the mere intention to make at some indefinite future time a new will, is not enough to prevent revocation." And in 1 Page on Wills, lifetime edition, § 478, at page 878, this is said:

"If the act of revocation is performed when testator does not intend that such act shall be conditional, and he is not induced to revoke by mistake, fraud, and the like, questions of dependent relative revocation do not arise although the ultimate disposition of testator's estate at his death may not be what he had contemplated when the original will was revoked in whole or in part."

See, in this connection: *In re Dougan's Estate,* 152 Or. 235, 271, 53 P. (2d) 511; *Worcester Bank & Trust Company v. Ellis,* 292 Mass. 88, 197 N. E. 637; *Doe dem. Crooks v. Cummings,* 6 Upp. Can. Q. B. 305, at 316; 1 Woerner, American Law of Administration, third edition, § 48, at page 129.

In cutting out parts of her will and canceling other parts Miss Bond acted under no mistake of either law or fact. The instant case in that respect differs from *Flanders v. White,* 142 Or. 375, 18 P. (2d) 823, wherein the testator destroyed his will and set up an account book, in the mistaken belief that it would effectively dispose of his property. He sent the book to his niece and wrote to her: "This takes the place of a will." The court held that the testator did not intend the revocation of his will to become effective unless the disposition of his property by account book entries was valid.

Our conclusion is that Miss Bond died intestate. Therefore, the decree appealed from is affirmed. Costs in this court are to be paid out of the estate of the decedent.